Salem Mathew BERNHARDT,
Appellant,

v.

STATE of Minnesota, Respondent.

Nos. C8–02–742, A03–1458.

Supreme Court of Minnesota.

Aug. 5, 2004.

Mark D. Nyvold, St. Paul MN, for Appellant.

Mike Hatch, St. Paul, MN, Michael K. Junge, McLeod County Attorney, Glencoe, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

From July 18 until July 20, 1999, the victim Randy Pool was held against his will and repeatedly beaten. On the evening of July 20 he was murdered. Although appellant Salem Mathew Bernhardt was in-carcerated in connection with a misdemeanor probation violation at all times throughout the kidnapping, beating, and murder of Pool, appellant was charged with aiding and abetting the crimes because of suspicion that he ordered the crimes from jail. An indictment was filed on December 4, 2000, charging appellant with five counts in the death of Pool: (1) first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (2000) (Count I); (2) first-degree ·felony murder (intentional murder while committing a kidnapping) in violation of Minn.Stat. § 609.185(3) (2000) (Count II); (3) second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1 (2000) (Count III); (4) kidnapping in violation of Minn. Stat. § 609.25, subd. 1(3) (2000) (Count IV); and (5) third-degree assault in violation of Minn.Stat. § 609.223, subd. 1 (2000) (Count V). Following a change of venue, the jury convicted appellant on all five counts. He was sentenced to life imprisonment without the possibility of parole on Count II, intentional murder while committing a kidnapping.

The following events preceded and constituted the murder of Pool and were presented to the jury at trial. In May or June of 1999, appellant and his then-pregnant fiancée, Heather Ecklund,[1] moved into the upstairs of Pool's house at 560 Brown Street in Hutchinson, Minnesota. Appellant and Pool sold drugs, mainly methamphetamine, from this residence, and according to appellant, each had their own set of customers whom they dealt with individually.

At the beginning of July 1999, appellant and Ecklund were preparing to move out of the Pool residence. In the days imme-

---

1. Appellant and Ecklund had had one child together, and at the time of these events Ecklund was pregnant with their second child.

diately following July 4, appellant and Ecklund traveled to Omaha, Nebraska, to visit an acquaintance of appellant, Jason Caldwell. Appellant had met Caldwell at a graduation party one or two months prior to the trip, and Caldwell was interested in starting a drug business in Omaha similar to appellant's. Appellant made arrangements for another acquaintance, Shawn McCollum, who appellant had met through Caldwell at the same graduation party, to stay at the Pool residence and handle his drug business while he was out of town.[2]

On approximately July 13, appellant and Caldwell left Nebraska and returned to Hutchinson so that appellant could introduce Caldwell to his drug supplier. Ecklund and Tanya Caldwell, Caldwell's wife, stayed in Nebraska. When appellant and Caldwell arrived in Minnesota, they stayed at the Pool residence; McCollum remained there as well.

The next day, July 14, appellant and Caldwell went to the home of Lance Mattson, another acquaintance of appellant, and attempted to purchase a handgun. Mattson did not sell appellant the weapon. When appellant and Caldwell left, Mattson telephoned the Hutchinson Police Department and reported that appellant and Caldwell had just been at his home in hopes of purchasing a handgun, and that they were staying at the Pool residence. At that time, both appellant and Caldwell had outstanding warrants for their arrests. Appellant's warrant was in connection with a misdemeanor probation violation for failure to comply with a disorderly conduct sentence, and Caldwell's warrant was in connection with a felony fifth-degree controlled substance probation violation.

Police officers were dispatched to Pool's residence to arrest Caldwell and appellant in connection with the outstanding warrants. When they arrived at Pool's house, they encountered Pool and asked him to bring Caldwell out of the house, which he did. Just prior to Caldwell's arrest, officers witnessed Caldwell handing Pool a roll of money. Caldwell also asked Pool to go into the house and retrieve a pair of Caldwell's black pants because Caldwell was only wearing shorts.

Upon arresting Caldwell, Officer Gregory Nadeau searched Caldwell and found a baggy containing a substance that was later identified as methamphetamine in the pocket of the shorts he had been wearing before retrieval of the black pants. Officer Nadeau seized the methamphetamine and transported Caldwell to jail. While Officer Nadeau was booking Caldwell, he asked Caldwell how much money he had given Pool, and Caldwell replied that it was approximately $2,200.

Officer Trevor Johnson remained on the scene after the arrest of Caldwell because he suspected that the money given to Pool should be seized, as it was most likely related to the sale of methamphetamine. After speaking with Sergeant Jeff Jones about the legality of seizing the money, Officer Johnson asked Pool to retrieve the money. Pool went into his house and came back with approximately $100, a significantly smaller amount of money than estimated by Caldwell. Upon questioning, Pool admitted that he kept some of the money so that he could "bail out" Caldwell. After further questioning by police, Pool seemed nervous, and finally admitted that appellant was in the residence as well.

2. Randy Jaster, a good friend of Pool's, testified that appellant called McCollum appellant's "bodyguard," though there is no indication as to when this comment to Jaster was made, nor is there evidence that Jaster visited appellant in jail or had any telephone contact with him.

Officer Johnson requested Pool's consent to search Pool's house. Upon obtaining Pool's consent, Officer Johnson found appellant in the back corner of the upstairs room near a closet area and arrested him. A subsequent search of the residence revealed a small amount of methamphetamine, other drug paraphernalia, and $2,598, which were seized.

On the night of the arrests, Pool did not spend the night at his home. Instead, he went to stay at Paula Colemer's residence, an acquaintance with whom he was not romantically involved and whose residence he had not stayed at previously. According to Colemer, Pool had told her that he did not want to stay at home that night because he was "scared for his life," and because he was afraid of McCollum and appellant. Pool also told Colemer that the next day he was going to change the locks on his home, change his telephone number, and have McCollum removed from his home.

The next day, July 15, Pool changed his phone number. According to the telephone company's service order, Pool changed it because he had an "ex-roommate that could charge calls to old [telephone number]."[3] The record also reflects that Pool purchased new door locks, but it is unclear whether or not they had been installed.

Ecklund and Tanya Caldwell traveled to Hutchinson from Nebraska on July 18 and immediately went to visit appellant and Caldwell in jail. Following the visit, they went to Pool's house. Ecklund and Tanya Caldwell began questioning both McCollum and Pool in the upstairs of the residence in an attempt to determine who had "narced" on appellant and Caldwell. Several individuals were present during the

questioning, including Christopher Olson and Rick Ligenza. Their attention shifted fully to the questioning of Pool, which included questioning about missing money and drugs. Pool repeatedly denied "narcing" on appellant and Caldwell, and the arguing escalated to physical violence against Pool, with most of the hitting and kicking being done by Ecklund and Ligenza. At one point, Pool attempted to escape down the stairs, but McCollum "body-slammed" him, brought him back upstairs, and confined him by duct-taping his wrists, upper body, and ankles. Tanya Caldwell threatened Pool with a taser, which is a high-voltage stun gun.

After this incident on July 18 and until July 20, Pool was bound with duct tape and repeatedly beaten. Another acquaintance of appellant, Isaac Engstrom, testified that McCollum called him on July 19 and asked him to come to the Pool residence because he found out who had "snitched" on appellant and Caldwell. When Engstrom arrived, Ecklund, McCollum, Toby Johnson, and Pool were present. When Scott Bernhardt, appellant's brother, arrived, the group began to beat and question Pool again. Pool was punched, kicked, and beaten with a closet rod. After each questioning and beating, Pool was duct-taped to a chair and placed in a small cellar that could only be accessed through a trap door in a closet floor. Other witnesses—including Brian Amundsen, David Oliva, Jessica Fank, Tina Artmann, and Chad Moehring—also testified to being present at the Pool residence over the three-day period and seeing Pool taped-up, beaten, or placed beneath the floor in the cellar.

---

**3.** Appellant later stated to police that when he called Ecklund from the Hutchinson Police Department, he did in fact charge the call to the Pool residence and that he had done so in the past as well.

On the evening of July 20, Pool was forced into a duffel bag by McCollum, and the duffel bag was zipped up. Ecklund sprayed aerosol into the bag, and McCollum stood on Pool's neck until his breathing could no longer be heard. McCollum and Engstrom carried the duffel bag containing Pool's body to a car and loaded the bag into the trunk. Ecklund then drove McCollum and Engstrom to a train trestle over the Clearwater River. Engstrom tied a concrete block to the duffel bag and, with McCollum's assistance, threw the duffel bag over the edge of the train trestle into the river below.

A citizen discovered the duffel bag floating in the river on July 28, 1999. The body had duct tape around the hands and feet, and a ligature around the neck. Doctor Janis Amatuzio, a medical doctor and forensics pathologist, testified that Pool died approximately five to seven days prior to being found. She also testified that the cause of death was lack of oxygen, but not by drowning, because there was no water in Pool's lungs. The body was not identified until August 3.

In the weeks following the arrests, Ecklund went to visit appellant in jail several times.[4] McCollum also visited appellant twice and Caldwell once.[5] Appellant also voluntarily told Agents McDonald and Russell in a police interview that during at least one of McCollum's two visits, McCollum put a piece of paper up to the glass that had written messages on it such as "don't worry" and "things are gonna be taken care of." Appellant told police that he interpreted those messages to mean that the drug business was still functioning.

Numerous phone calls were also placed before and after the murder from appellant's and Caldwell's cell block, Cell Block E, to Pool's residence—both the old and changed number—and to the residence of another of appellant's friends, Isaac Engstrom. All of the calls to the Pool residence were either unanswered or refused, but several calls to Engstrom's residence were answered. The record does not reflect who was making what calls. Engstrom, however, testified that he talked to appellant on the phone "a few times" while appellant was in jail, including "right after" the arrest, because appellant was trying to contact Ecklund in Nebraska and did not know how to reach her. Engstrom also testified that he did not receive any "orders" from appellant during their phone conversations.

On August 3, a search warrant was executed to search the Hutchinson apartment that Ecklund had moved into after Pool's death. Officer Scott Schuette testified that three handwritten documents were found during the search. First, officers found what appears to be a forged "confession" by Pool, acknowledging responsibility for the drugs found during the arrest of Caldwell. Second, they found a mailed letter dated July 21, 1999, from appellant to Ecklund, stating:

I talked to [Caldwell] Tuesday night. He had some interesting words to say. In order for [Caldwell] to get out of his charges Randy needs to make a recorded statement to the County Attorney. Either [Pool] or someone else. It would be more reliable coming from him. If Randy doesn't give a statement I'm not going to guarantee his safety from other people. There will not be anything I

---

4. Ecklund visited appellant in jail on the following dates in 1999: July 18, July 20, July 22, July 25, July 27, July 29, August 1, and August 3.

5. McCollum visited Caldwell and then appellant in jail on July 22, 1999, and appellant on July 25, 1999.

can do to help him. So he pretty much does not have a choice in the matter.

The letter also instructs Ecklund to burn the letter when she's finished reading it. Finally, in a letter from appellant to Ecklund dated July 24, 1999, appellant tells Ecklund to thank McCollum, Engstrom, and Lawrence Artmann.[6] He states, "Ya know I really hate owing favors, but for the guys I guess I'll make an exception. Hee hee."

In statements to the police that were recorded and played for the jury at trial, appellant offered his interpretation of the three written documents. First, as to the forged confession, appellant stated that he didn't know anything about it. The writing on the forged confession was never analyzed, and no accusation was ever made that appellant wrote the confession. Second, appellant stated that he believed, because of what Caldwell had told him in jail, that Pool had planted the drugs on Caldwell by placing them in the pants retrieved by Pool when Caldwell was arrested. Therefore, appellant wrote the July 21 letter to Ecklund stating that Caldwell had told him "some interesting words" and that Pool should sign a written statement saying that the drugs were Pool's. Appellant stated that when he later found out the drugs were in the shorts Caldwell was wearing, and not the black plants retrieved by Pool, he thought Caldwell was lying about the fact that Pool planted the drugs on Caldwell. Appellant explained that he was not threatening Pool, but rather trying to "protect" Pool by telling him to comply with Caldwell's wishes, because he didn't know "what [Jason Caldwell was] capable of."

As to the letter thanking McCollum, Engstrom, and Lawrence Artmann, appellant stated to law enforcement agents that he was thanking his friends for watching over Ecklund while she was pregnant and appellant was incarcerated, driving Ecklund to see appellant while he was in jail, and helping Ecklund move into her new apartment. He also said that he was thanking Artmann for lending appellant a camcorder and for earlier driving appellant to see a friend in the country.

In addition to the written documents, other evidence was introduced at trial regarding appellant. Mattson, who was the actual "snitch" responsible for the arrests of appellant and Caldwell, testified that earlier in the year, appellant approached Mattson and told him he heard that Mattson was a "snitch." Mattson testified that appellant went on to say that he did not believe Mattson was a snitch because "he didn't see how that was possible that I would still be a snitch and still be alive." When further questioned, Mattson testified that he understood this to mean, "That snitches end up dead." Mattson also testified at trial that when he was in jail with Caldwell on an unrelated charge after the murder, Caldwell told him that someone got killed in Oklahoma in 1991, and that "whoever snitched on [Caldwell], the same fate was going to be bestowed them as it did this other person back in '91." Mattson went on to testify that he told a Minnesota Bureau of Criminal Apprehension ("BCA") agent that Caldwell told him, "[I]f Randy Pool was the snitch, that his partner, [McCollum], would know what to do about it, and that they would find Randy in a bag in the river." In fact, through the direct actions of McCollum

6. Lawrence Artmann, who appellant describes as someone who is "like a brother" to appellant, burned a bag allegedly containing some of Pool's clothing at the request of McCollum after Pool's murder. At trial, he testified that he did not know what the bag contained.

and others, Randy was found "in a bag in the river."

Police officers and agents from the BCA also interviewed appellant extensively following the identification of Pool's body, and audio tapes of the interviews were played for the jury at trial. At all times throughout the interviewing process, appellant strongly denied any suggestion by officers and agents that he had instructed others to murder Pool or that he had told them to "rough up" Pool. Appellant further maintained his innocence when BCA Special Agent Paul Soppeland falsely told appellant during their August 6, 1999, interview that Ecklund and McCollum had "confessed" to the murders and had stated that appellant "wanted it done." In fact, according to the testimony presented at the postconviction hearing, neither Ecklund nor McCollum told law enforcement authorities that appellant wanted Pool murdered.[7] David Oliva, who, on McCollum's and Johnson's orders, disposed of Pool's car following the murder, acknowledged at trial that he stated to law enforcement officers in an interview after the murder: "To my knowledge, [appellant] doesn't even know about any of this yet and never did."

Because of their participation in the kidnapping, beating, and murder of Randy Pool, several individuals have been incarcerated following trials or plea negotiations. McCollum and Johnson were convicted of first-degree murder and are serving life sentences. Ecklund and Engstrom were convicted of second-degree murder and are serving approximately 20–year sentences. Tanya Caldwell served a sentence for kidnapping, and appellant's brother, Scott Bernhardt, is serving a sentence of approximately three years for aiding and abetting a kidnapping.[8]

Of central importance in this case are the facts surrounding the admission of portions of Agent Soppeland's interview with appellant. Throughout the trial, appellant was represented by a public defender of 20 years. Prior to and during the trial, trial counsel sought to have portions of the audiotaped August 6, 1999, interview between Agent Soppeland and appellant redacted before being played to the jury. Trial counsel highlighted portions of the transcript of the interview that he wanted to have redacted. As evidenced by its letter to the district court on January 17, 2002, the state agreed with many of the redactions suggested by trial counsel. The district court then ruled on whether or not those portions would be redacted from the audiotape, ordering some redactions and denying others.

Later, at trial, while Agent Soppeland was testifying, the state played the redacted audiotape of the August 6, 1999, interview between Agent Soppeland and appellant for the jury. The jury heard the following exchange between Agent Soppeland ("PS") and appellant ("SB"):

PS: All right, ah now I'm going to tell you something and listen real closely here cause this is important, we have talked to [McCollum], we also talked to [Ecklund].

SB: Okay.

PS: They have confessed to this.

SB: That

7. In stark opposition to what the jury was told, the evidence at the postconviction hearing suggested that McCollum and Ecklund each implicated each other in the murder, not appellant.

8. Appellant was indicted in December of 2000, and although not specified in the record, it appears that he has been incarcerated for approximately four and one-half years since then.

PS: They have told us that they killed Randy and that they took his body and dumped it, but they are also saying that you wanted it done.

SB: No, that's not true, I don't believe that Heather had anything to do with it either.

Later in the audiotape, the jury also heard Agent Soppeland telling appellant that McCollum and Ecklund had not said that appellant told them to kill Pool, but rather to only "rough him up," and appellant denying making those statements as well. Trial counsel had not previously asked to have these statements redacted, did not object to their admission at trial, and did not cross-examine Agent Soppeland as to the falsity of the statements nor ask the court for a limiting instruction.

At the close of trial, the jury convicted appellant of first- and second-degree murder and kidnapping, and he was sentenced on the first-degree felony murder conviction to life imprisonment without the possibility of parole. Appellant filed his direct appeal with this court on May 6, 2002, but on November 15, 2002, he asked this court to stay his appeal so he could pursue postconviction relief. Appellant requested postconviction relief on several grounds: insufficiency of the evidence presented at trial, erroneous admission of testimony, and ineffective assistance of trial counsel and prosecutorial misconduct based on the admission of Agent Soppeland's false statements.[9]

At the postconviction hearing, much of the focus was on the admission of Agent Soppeland's interview with appellant, specifically those portions of the interview in which Agent Soppeland falsely told appellant that Ecklund and McCollum implicated appellant in the murder of Pool. Trial counsel testified that he had made extensive efforts to redact portions of the interview, but made a mistake in not including the portions in which the false statements were made in his requests for redaction. In support of his testimony, trial counsel pointed to another section of the audiotape that he was successful in getting redacted that was very similar in nature—in that Agent Soppeland told appellant that other people had confessed and implicated appellant in Pool's murder. Trial counsel also noted that in the January 17, 2000, letter from the state to the district court, the state agreed that this similar portion of the audiotape was irrelevant and should be redacted. Finally, trial counsel vigorously rejected the state's contention that the submission of Agent Soppeland's false assertions and appellant's denials was part of the defense strategy.

The postconviction court denied appellant's petition for postconviction relief. In doing so it concluded that the evidence was sufficient for the jury to convict appellant of first-degree murder. The court also held that defense counsel's failure to request that the false statements of Agent Soppeland be redacted was a matter of trial strategy. Accordingly, it ruled that the statements were properly admitted, that appellant received effective assistance of trial counsel, and that no prosecutorial misconduct occurred because it was reasonable for the prosecutor to believe that the admissions were part of defense counsel's trial strategy. Further, the court held that although Paula Colemer's testimony that Pool told her he was afraid of appellant and McCollum was irrelevant and therefore had wrongfully been admitted, the court held that the

---

**9.** Appellant also requested postconviction relief on the basis of an alleged *Miranda* violation, but did not raise this issue on appeal.

unobjected-to improper admission of this evidence was not plain error and did not deprive appellant of a fair trial. The balance of appellant's evidentiary bases for postconviction relief were rejected by the court. On October 7, 2003, this court granted appellant's request to consolidate his direct appeal and appeal from the denial of postconviction relief.

## I.

 First we must determine whether the admission of certain testimony and statements at trial was error. This court does not reverse evidentiary rulings of a district court unless there is a clear abuse of discretion, given that "[r]ulings on evidentiary matters rest within the sound discretion of the trial court * * *." *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003). On appeal, the appellant carries the burden of demonstrating that "the trial court abused its discretion by admitting the evidence and that the defendant was thereby prejudiced." *Id.*

### A. Testimony of Paula Colemer

 The first evidentiary issue we must address is whether the admission of testimony by Paula Colemer that Pool told her he was afraid of McCollum and appellant was error. In *State v. Blanchard*, 315 N.W.2d 427 (Minn.1982), we held that evidence of a victim's fear of a perpetrator is admissible only when all three of the following conditions are met:

a. The victim's state of mind must be a relevant issue. The victim's state of mind is generally relevant only where the defendant raises the defense of accident, suicide, or self-defense.

b. The trial court must weigh the probative value of the evidence against the risk of unfair prejudice to the defendant.

c. A proper limiting instruction must be given to the jury.

*Id.* at 432–33. According to *Blanchard*, these conditions are necessary because of "the risk that the jury will consider the victim's statements of fear as a true indication of a defendant's intentions or actions." *Id.* at 432 (citing *Campbell v. United States*, 391 A.2d 283, 287 (D.C.App.1978)).

None of these conditions have been met in this case. The victim's state of mind in this case was not a relevant issue—appellant did not raise the defenses of accident, suicide, or self-defense. While it is difficult to assess the second and third prongs of this analysis because the admission of the testimony at issue was not objected to at trial, the trial court did not weigh the probative value of the testimony against the unfair prejudice and a proper limiting instruction was not given to the jury. Therefore, as also determined by the postconviction court, the admission of Colemer's testimony as to the state of mind of Pool was error.

 A finding of error does not require a new trial if the error was harmless beyond a reasonable doubt. *State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997). In determining whether error was harmless, we must examine the basis upon which the jury rested its verdict, and if the verdict was "surely unattributable" to the error, it is harmless. *Id.* at 292 (quoting *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996)). Here the error was harmless because the evidence was cumulative—the jury could have inferred Pool's fear of appellant and McCollum by the facts that he did not spend the night at his home, changed his phone number, and purchased new door locks for his home. Nonetheless, Colemer's testimony will not be considered in support of the verdict in our determination of the sufficiency of evidence issue.

### B. False Statements of Agent Soppeland

 Next we must determine whether the admission of false statements made by

Agent Soppeland during his interview with appellant was error.[10] Appellant argues that the statements were both inadmissible hearsay and violative of the Confrontation Clause.

While the admission of Agent Soppeland's audiotaped statements was not objected to at trial, we have the discretion, on appeal, to determine whether the admission of such evidence constituted plain error affecting substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998); *see* Minn. R. Evid. 103(d); Minn. R.Crim. P. 31.02. The plain error standard requires appellant to show that: (1) there was error, (2) it was plain, and (3) the error affected appellant's substantial rights. *Id.* In order to prove the third prong, appellant bears a "heavy burden" of persuasion to show that "the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. If appellant proves each prong of the plain error test, we must "then assess[ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* at 740.

The state argues that our holding in *State v. Tovar*, 605 N.W.2d 717 (Minn. 2000), should control the outcome of this case. In *Tovar*, we held a defendant's taped interview with a law enforcement agent, where the law enforcement agent repeated exaggerated statements of code-fendants implicating defendant's guilt and embellished his knowledge of facts sur-

rounding the crime, to be admissible. However, *Tovar* is distinguishable from this case in several important respects. First, the law enforcement agent in *Tovar* was cross-examined and admitted to the jury that during interrogations the police often "make more" of the evidence they have to illicit information from suspected criminals, and specifically testified that police would "often claim that other persons had told them that the suspect has details about the crime not commonly known," giving a specific example of a point in the interrogation at which he had done so. *Id.* at 725. This is different than the present case, where Agent Soppeland made false statements during the interview, and the jury was never told that those statements were not true.

Further, and important to our analysis, while the law enforcement agent in *Tovar* admitted that he exaggerated *his knowledge* of facts regarding the crime during the interrogation, the exaggerated facts turned out to be true. *Id.* at 725. In this case, a tape was played in which Agent Soppeland made a false statement that others implicated appellant in the murder. The jury was never told that this statement was not true—not on cross-examination, not in a limiting instruction, and not in closing arguments. Therefore, *Tovar* is distinguishable from this case in important respects, and our plain error analysis should control the determination of this issue.

---

10. This case does not raise the issue of the legality or appropriateness of certain interviewing tactics used by law enforcement agents, but rather whether the admission of false statements by law enforcement agents during a jury trial was error. *See State v. Jones*, 566 N.W.2d 317, 326 (Minn.1997) (noting that police officers falsely told defendant that a surveillance tape recorded his illegal actions when in fact no such tape existed, and that when police officers realized their mis-

take they did not inform defendant); *State v. Thaggard*, 527 N.W.2d 804, 810 (Minn.1995) (holding that the use of trickery and deception by law enforcement agents is to be considered when determining the admissibility of a subsequent confession); *State v. Moorman*, 505 N.W.2d 593, 598 n. 3 (Minn.1993) (noting that a BCA Agent told appellant that certain evidence linked appellant to the murder when, in fact, no such evidence existed).

The admission of the statements in this case is error that is plain because the statements, by the application of well-settled law, constitute inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). In this case, Agent Soppeland's statements that Ecklund and McCollum allegedly implicated appellant in the murder of Pool were made outside of the trial, and because there was no objection, cross-examination, or limiting instruction, the statements were before the jury as statements supporting the truth of such implications.

Further, even if otherwise admissible, our rules state that "relevant evidence" may be excluded at trial "if its probative value is substantially outweighed by the danger of unfair prejudice * * *." Minn. R. Evid. 403. As an initial matter, it is difficult to characterize false evidence as "relevant evidence." But *assuming* that it is relevant, in a case such as this, based heavily on circumstantial evidence, statements by a law enforcement agent that others have implicated appellant come closer to direct evidence than anything else the jury heard. Consequently, the unfair prejudice of allowing the jury to hear the false statements largely outweighs their probative value, especially considering the fact that the only probative value of the evidence, as argued by the state, was to allow appellant's denials to be heard by the jury. The jury had already heard appellant's repeated denials to accusations that he directed the murder of Pool in the balance of the properly admitted portions of appellant's interviews with Agents Soppeland, McDonald, and Russell, and Officer Schuette. Therefore the probative value of admitting appellant's denials in response to Agent Soppeland's false

statements is *de minimus*, if it exists at all.

Having concluded that the admission of Agent Soppeland's questions was error that was plain, we must decide what effect the error had on appellant's substantial rights. Here, the jury heard a law enforcement agent state that McCollum and Ecklund directly implicated appellant in the murder of Pool, when in truth McCollum and Ecklund implicated each other in the murders. The jury was never told that this information was false. Given the weight and sparseness of the balance of the evidence, it is inconceivable that the false statements did not influence the jury and, in turn, affect appellant's substantial rights. Moreover, the error within the context of the entire trial undermines the fairness and integrity of the judicial proceedings. The alleged accusations of two accomplices were, taken together, the most compelling piece of evidence—and it was false. We therefore hold that the admission of portions of Agent Soppeland's interview with appellant at issue here was plain error.

## II.

 Finally, we must determine whether the evidence is sufficient as a matter of law to support appellant's conviction. In reviewing the sufficiency of evidence in a criminal case, "we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978). We will not disturb the verdict "if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [a] defendant was proven guilty

of the offense charged." *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979) (quoting *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965)). We consider the evidence in the light most favorable to the verdict. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978).

■ Circumstantial evidence is entitled to the same weight as direct evidence; however, if a conviction is based on circumstantial evidence, a higher level of scrutiny is warranted. *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988). The circumstances proved must be "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id.* We have stated, "[I]n such cases the circumstantial evidence must do more than give rise to suspicion of guilt; 'it must point unerringly to the accused's guilt.'" *State v. Scharmer,* 501 N.W.2d 620, 622 (Minn.1993) (quoting *State v. Loss,* 295 Minn. 271, 281, 204 N.W.2d 404, 409 (1973)).

■ Minnesota Statutes § 609.05, subdivision 1 (2002), states, "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Because appellant was in jail on a misdemeanor probation violation and it was physically impossible for appellant to aid others in the commission of Pool's actual kidnapping and murder, we examine the evidence to see whether it is sufficient to convict appellant of advising, hiring, counseling, or conspiring with those who physically assaulted, kidnapped, and mur

dered Pool. To succeed on a claim of liability for aiding and abetting, the state must prove that appellant "played a knowing role in the commission of the crime." *State v. Gates,* 615 N.W.2d 331, 337 (Minn. 2000). This court distinguishes between a "knowing role in the crime" and "inaction, knowledge, and passive acquiescence." *Id.* Active participation in the actual commission of the offense is not required to constitute the aiding and abetting of that crime, and appellant's "presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *Id.*

This is a case based entirely on circumstantial evidence.[11] It is one thing to argue that the circumstantial evidence supports the state's theory of the case—which arguably it does—and another to conclude that the legal requirement that no other rational hypotheses can be drawn from the facts is met. A review of the evidence considered in the conviction of appellant is necessary to determine whether it points "unerringly" to appellant's guilt. *See Scharmer,* 501 N.W.2d at 622.

The circumstantial evidence implicating appellant in the kidnapping, beating, and murder of Pool is as follows: (1) the murder was committed after appellant had been arrested in the home of Pool, and Pool was initially, although incorrectly, thought to be the "snitch" who led the police to Pool's home; (2) Pool would not sleep at his home the night of the arrest of appellant and Caldwell and changed his

**11.** "Direct evidence" is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Black's Law Dictionary* 596 (8th ed.2004). "Circumstantial evidence" is defined as "[e]vidence based on inference and not on personal knowledge or observation" and "[a]ll evidence that is not

given by eyewitness testimony." *Id.* at 595. The fact to be proved in this case is that appellant advised, hired, counseled, or conspired with others to commit the kidnapping and murder of Pool. *See* Minn.Stat. § 609.05, subd. 1 (2002). No direct testimony exists proving that fact, nor any evidence that does not require inference or presumption.

locks and phone number the next day; (3) appellant received several visits from his fiancée, Ecklund, before the murder, during which time it would have been possible for appellant to order the murder of Pool; (4) before the murder, appellant called Engstrom from jail and spoke with him on the phone; (5) appellant wrote a letter to Ecklund telling her that he would not be able to protect Pool from others if Pool did not sign a written confession; (6) appellant wrote a letter to Ecklund telling her to thank McCollum, Engstrom, and Lawrence Artmann and that he hated "owing [them] favors"; (7) at some point in the months preceding his arrest, appellant told Mattson that he did not believe Mattson was a "snitch" because he was still alive, and Mattson took this to mean "[t]hat snitches end up dead"; and (8) one witness testified that appellant called McCollum his "bodyguard" at an unspecified time.

Clearly, examining appellant's presence, companionship, and conduct before and after the murder, it is possible to speculate or infer that appellant possessed *some* criminal intent. It is less clear that no other inference can be drawn "inconsistent with any rational hypothesis except that of guilt." A review of the record makes it impossible to conclude that the evidence points "unerringly" to appellant's guilt. The volume of damning evidence against Caldwell—who was never indicted or prosecuted for aiding and abetting in Pool's murder—is particularly troubling. Caldwell was the individual who told appellant—falsely—that Pool planted drugs on him and that Pool should write a letter exonerating Caldwell. McCollum, who was described by Caldwell as "[Caldwell's partner," was initially Caldwell's friend—not appellant's—and it was Caldwell who introduced McCollum to appellant. Mattson testified that while in jail, Caldwell openly talked about the possibility of murdering Pool if Pool was the "snitch" because he had murdered at least one "snitch" in the past. It is Caldwell—not appellant—against whom we have direct evidence that he told Mattson that "if Randy Pool was the snitch, that his partner [McCollum] would know what to do about it and that they would find Randy in a bag in the river." In fact, Pool was murdered by Caldwell's partner, McCollum, and others, and his body was discovered in a bag in the river.

In addition to the rational hypothesis that Caldwell directed Pool's murder, the circumstances surrounding the kidnapping, beatings, and murder also support a hypothesis that the perpetrators of the violence acted on their own. While the assault and murder were ghastly, the alleged linkage to appellant does not explain what transpired at Pool's home. The codefendants—Ecklund, McCollum, Engstrom, and Johnson—incorrectly viewed Pool as a "snitch" and clearly participated in his murder. There is testimony that at least one of the participants in the murder, Engstrom, was using methamphetamine "heavily" during July of 1999. Engstrom testified that when he took methamphetamine he would get "high," stay awake for about a week, and did not eat at all during those time periods. Engstrom also testified that the perpetrators' reasons for questioning and beating Pool were threefold: (1) they believed Pool "snitched" on appellant and Caldwell; (2) they knew that money and drugs were missing;[12] and (3) they believed Pool was a pedophile and

---

12. It is unclear based on Engstrom's testimony who the missing drugs and money belonged to.

child molester.[13] As the dissent notes, Engstrom testified that the reason Pool was murdered was because *Engstrom* believed "there were too many 'narcs' around and 'they were going to have to make an example out of somebody.'" All of this evidence supports the hypothesis that the kidnapping, beating, and murder of Pool could have constituted the escalating actions of irrational individuals that became an out-of-control melee.

In sum, the facts in the record are as consistent with a theory that Caldwell ordered Pool's murder or that a group of out-of-control individuals acting in concert murdered Pool on their own, as with a theory of appellant's guilt. If our standard on circumstantial evidence means anything, it means that appellant cannot be convicted on this record that does not exclude other rational hypotheses. We therefore hold that the evidence was insufficient to support appellant's convictions for first-degree premeditated murder, first-degree felony murder, second-degree intentional murder, kidnapping, and assault.

We reject the dissent's conclusion that motive coupled with the other evidence creates a sufficient basis for conviction, because its analysis is faulty in significant respects. First, the dissent places undue emphasis on evidence of motive. Nothing in the case relied on by the dissent regarding motive evidence, *State v. Berndt*, 392 N.W.2d 876 (Minn.1986), changes the proper standard for evaluating a conviction based solely on circumstantial evidence. *See id.* at 880. In fact the court applied the circumstantial evidence standard in *Berndt* to reverse the conviction. *Id.* at

881. Second, in emphasizing the existence of sufficient evidence to support conviction, the dissent fails to apply the correct legal standard—that exclusively circumstantial evidence is sufficient to support a conviction only if there is no other rational hypothesis from the evidence than guilt. *See Bias*, 419 N.W.2d at 484. Third, in evaluating the evidence, the dissent turns a blind eye to any rational inference other than guilt. An exhaustive review of the dissent's approach to the evidence is not necessary to demonstrate the weakness of its analysis. A few examples will suffice.

The dissent relies on evidence of contact appellant had with others while he was in jail. Appellant did receive visits from Ecklund before and after the murder. However, there is no indication that appellant discussed or ordered the murder of Pool during these visits, and it is understandable that appellant's pregnant fiancée would frequently visit him in jail, regardless of the existence of any criminal intent or activity. Additionally, Tanya Caldwell also visited Caldwell prior to Pool's murder and could have received instructions from Caldwell to murder Pool. The same analysis applies to the phone calls from appellant to Engstrom in the days after his arrest. There is no proof that appellant ordered Engstrom to murder Pool; in fact, Engstrom testified that he received *no* such orders from appellant during those conversations and that appellant was merely attempting to contact Ecklund while she was still in Nebraska.

As evidence of intent to aid or conspire to murder Pool, the letters to Ecklund are of little value because they were composed and mailed *after* the murder of Pool.[14]

**13.** While these allegations regarding child molestation were made by Engstrom, there is no proof in the record supporting the allegations against Pool.

**14.** The murder of Pool occurred on the evening of July 20, 1999. Appellant's first letter is dated July 21, 1999, and bears a postmark of July 23, 1999. Appellant's second letter is

Ecklund visited appellant two days after the murder and disposal of Pool's body, and if appellant had ordered the murder, Ecklund most likely would have told him about the murder then, and appellant would not have written to Ecklund telling her to give a message to Pool. Even assuming that the letters were contrived to be written after Pool's murder to make appellant look innocent, the content of the letters does not unerringly implicate appellant in Pool's murder. The July 21 letter, in fact, which is edited by the dissent to exclude appellant's statement that he had been speaking with Caldwell, states that appellant will not be able to protect Pool from "other people." By the plain language of the letter, "other people" could be construed to mean Caldwell, as appellant warns Pool that he, appellant, had recently spoken to Caldwell, Caldwell "had some interesting words to say," and that Pool should write a confession to get Caldwell "out of his charges." The dissent's assertion, that "there is no other reasonable hypothesis for this letter" than the hypothesis that the letter represented an instruction from appellant to carry out the murder of Pool, simply ignores the rational alternative.

The July 24 letter is similarly vague, as appellant does not specify what he is thanking McCollum, Engstrom, and Lawrence Artmann for. Even assuming that appellant's explanation that he was thanking them for helping his pregnant fiancée while he was incarcerated is to be rejected and, reprehensibly, that he was pleased at the news of Pool's death—standing alone without more concrete evidence—does not mean that he aided and abetted the murderers.

In sum, the dissent goes a long way to emphasize that appellant ran a drug business with the aid of McCollum, that several of appellant's acquaintances murdered Pool, and that appellant had the motive and opportunity to order the murder of Pool; however, the dissent provides *no* evidence that such a directive was actually given.[15] The lack of evidence is especially telling given that throughout the trials and plea negotiations of Pool's murderers as detailed by the dissent, not a *single* defendant testified or stated to law enforcement that appellant ordered the murder, even though doing so would most likely be advantageous to them in negotiating a plea. Thus, in weaving its theory of the case, the dissent ignores our standard of review regarding convictions based entirely on circumstantial evidence, and disregards the feasible and rational possibilities that Caldwell ordered Pool's murder or that appellant's acquaintances murdered Pool on their own. The whole of the evidence does not "make such theories seem unreasonable," as urged by the dissent. *See State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995).

In determining whether the circumstantial evidence in this case is sufficient we can obtain further guidance from a similar case, *State v. Jones*, 516 N.W.2d 545 (Minn.1994), in which we held the circumstantial evidence to be insufficient to support a defendant's aiding and abetting second- and third-degree assault convictions, even though the defendant's brother shot the victim with the defendant's gun and

---

dated July 24, 1999, and bears a postmark of July 26, 1999.

**15.** The dissent makes repeated reference to a "standing order" to murder Pool; however, no evidence exists proving that there was an order to assault or kill any person. By its use

of the term "standing order," the dissent appears to be distorting the fact that appellant asked McCollum to watch over his drug business in a business capacity while he was in Nebraska.

there was a clear showing of motive and opportunity. In *Jones*, the defendant and victim, who were coworkers, had a confrontation the day before the shooting, in which the victim grabbed the defendant, causing the defendant to wet his pants. *Id.* at 547. The defendant was so embarrassed about the incident that he did not go to work the next day. *Id.* The defendant and his brother saw each other over the next day, and, according to one witness, were talking to each other within a half hour of the time of the attempted murder of the victim. *Id.* at 547–48. The defendant's brother then shot the victim with the defendant's gun. *Id.* at 547. When police arrested the defendant's brother, he was carrying $53.15, despite the fact that earlier in the day he told friends he wasn't carrying enough cash to purchase liquor. *Id.* at 547–48. It was the state's theory that the defendant paid his brother $50 to shoot the victim. *Id.* at 548. In ruling this evidence insufficient, we held that, "to support [the defendant's] convictions for aiding and abetting second and third degree assault, the state needed to establish a sufficient link between [the defendant] and his brother's actions, and on this point the state has failed." *Id.* at 549. We also stated:

> According to the state's theory, [the defendant's brother] was motivated to avenge the wrongs to [the defendant], who paid him to act and assisted him by identifying [the victim] and by supplying the weapon and the bicycle that [the defendant's brother] rode to the site of the crime. The actual evidence presented at trial, however, certainly does not point unerringly to [the defendant]'s guilt * * *. *Other rational conclusions, such as the conclusion that [the defen-*

*dant's brother] determined on his own to avenge the wrongs to [the defendant], are consistent with the evidence presented * * *.*

*Id.* (emphasis added).

Our description of the insufficiency of evidence in *Jones* can be applied equally to the evidence in this case. While it is plausible that appellant wanted Pool to be killed out of revenge for his arrest, the evidence at trial was insufficient to establish a connection between that desire and the murder of Pool by several of appellant's acquaintances. On the evidence before us, we conclude that it is equally plausible that, as noted by appellant, the acquaintances "determined on [their] own to avenge the wrongs" believed to have been done to Caldwell and appellant, or were acting on instruction from Caldwell.

In summary, we hold that the district court erred in admitting Colemer's testimony regarding the statements made by Pool and the disputed portions of Agent Soppeland's interview with appellant. We further hold that the properly-admitted, exclusively-circumstantial evidence, as a whole, is insufficient as a matter of law to convict appellant of first-degree murder, felony murder, intentional second-degree murder, kidnapping, or assault. Accordingly, appellant's convictions are reversed.[16]

Reversed.

GILBERT, Justice, (concurring in part, dissenting in part).

I concur with the majority opinion relating to the admission into evidence of portions of Agent Soppeland's interview being plain error. However, I respectfully dissent from the majority's conclusion that

---

**16.** Because of our holding, it is unnecessary to address the other issues raised by appellant, including his claims of ineffective assistance of trial counsel and prosecutorial misconduct.

there is insufficient evidence as a matter of law to support Bernhardt's conviction. I believe that there was sufficient evidence presented to the jury to support Bernhardt's conviction for aiding and abetting the first-degree murder that took place as part of the kidnapping of Randy Pool. Accordingly, I would reverse and remand for a new trial.

The circumstantial evidence presented in this case is substantial and consistent with Bernhardt's conviction. In addition, we have held that "if the state can establish a credible motive, credibility is lent to the state's contention that the accused committed the crime." *State v. Berndt,* 392 N.W.2d 876, 879 (Minn.1986). Here, the state not only established a credible motive, but Bernhardt's defense counsel conceded that motive was present in this case.

During 3 days in July 1999, Pool was kidnapped and murdered by Shawn McCollum (Bernhardt's "bodyguard"), Heather Ecklund (Bernhardt's girlfriend), and other close associates of Bernhardt. These associates included Toby Johnson, Scott Bernhardt (Bernhardt's brother), Isaac Engstrom, Rick Ligenza and Tanya Caldwell. Pool was beaten, bound, and gagged by the use of duct tape, thrown in a duffel bag, sprayed with aerosol, stomped on and finally thrown into the Clearwater River after having been killed.

As we have previously held, "companionship and conduct before and after the offense are circumstances from which a person's participation in [a crime] may be inferred." *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981). The extent of Bernhardt's companionship and course of dealing with each of the six individuals who actually committed the assault, kidnapping, and murder is both substantial and significant. Both Bernhardt and Pool were dealing methamphetamine out of

Pool's home in Hutchinson. Bernhardt had his own set of customers, as did Pool. When Bernhardt was out of town on business, McCollum also lived in the Pool residence to operate Bernhardt's business and to take care of Bernhardt's set of customers. McCollum also watched over Bernhardt's personal belongings and those of his girlfriend, Ecklund, who at the time was 5-months pregnant with Bernhardt's child. In a statement given to the police, Bernhardt acknowledged running this drug business as "my little branch." Chad Moehring testified that Pool was killed because Bernhardt's cohorts thought Pool had "narked off" or told the authorities about Bernhardt's drug dealings. Moehring further testified that Engstrom told him there were too many "narks" around and they were going to have to make an example out of somebody. Bernhardt conceded at oral argument that the evidence would support that he had a motive and an opportunity to aid and abet in this brutal drug-related murder.

Bernhardt's companions were found guilty of Pool's kidnapping and murder. On March 29, 2000, a jury found McCollum guilty of murder in the first degree while committing kidnapping of Pool, and we affirmed that conviction. *McCollum v. State,* 640 N.W.2d 610, 619 (Minn.2002). On February 3, 2000, Ecklund pleaded guilty to second-degree murder of Pool. *In Re Contempt of Ecklund,* 636 N.W.2d 585, 587 (Minn.App.2001). Toby Earl Johnson, another business associate of Bernhardt, gave a statement to the police on August 9, 1999, where he admitted that he had beaten and watched over Pool while Pool was being tortured, confined, and placed in a duffle bag until beaten to death. Ultimately, Johnson pleaded guilty to first-degree intentional murder while committing kidnapping and was sentenced to a mandatory life sentence. Although John-

son attempted to withdraw his plea agreement, the postconviction court denied that request and we affirmed the denial. *Johnson v. State*, 641 N.W.2d 912, 918 (Minn. 2002). Tanya Caldwell also pleaded guilty to kidnapping Pool and received a 4–year sentence. Isaac Engstrom pleaded guilty to second-degree intentional murder in the death of Pool. The jury knew of both Engstrom's and Tanya Caldwell's plea through their testimony. While these judgments and pleas were not presented at Bernhardt's trial, the evidence was presented to the jury in a variety of manners, and while not controlling our decision, we may take judicial notice of these three appellate decisions involving the murder of the same victim, Pool. Although Bernhardt was not present at the time of the actual murder, his conduct and companionship with the assailants directly link him to Pool's murder.

Bernhardt had ample opportunity to facilitate this crime. Bernhardt was talking to Ecklund on a regular basis when she visited him at least three times in one week (July 18, 20 and 22) after he was incarcerated at the McCloud county jail. Ecklund was a major participant and instigator of trying to determine who tipped off the police about Bernhardt and who stole some of their personal belongings. Immediately after Ecklund met with Bernhardt at the jail on July 18, 1999, the effort to punish the alleged "snitch" quickly focused on Pool, who was detained and assaulted by McCollum as he attempted to escape after the accusation surfaced and the confrontation escalated.

Bernhardt admitted talking to Ecklund about Pool while he was in jail and asking Ecklund to find out who had "snitched" and also to find out what happened to their personal belongings. During an August 6, 1999 interview with the police, Bernhardt admitted that he knew that Pool and Ecklund had engaged in a "small skirmish" when Pool was in the process of kicking Bernhardt and Ecklund out of his home. At the time of this interview, Bernhardt was informed that Ecklund was in jail and being charged with murder. Bernhardt also admitted that he was disgruntled with Pool's alleged actions. There were at least six telephone calls from Bernhardt's cellblock to Engstrom's apartment.

Witnesses testified that Bernhardt had a standing order against Pool. Randy Jaster, a long-time friend of the victim, testified that McCollum was Bernhardt's bodyguard, and Bernhardt "would have [Pool] taken care of." To corroborate Jaster's testimony, David Oliva testified that it was his understanding that when Bernhardt was gone, McCollum was acting on Bernhardt's behalf. Lance Mattson testified that he had a conversation with Bernhardt where Bernhardt indicated to him that people who "snitch" are often killed. Mattson testified that he interpreted Bernhardt's comment to generally mean, "snitches end up dead."

Bernhardt's July 21, 1999 letter to his girlfriend Ecklund reinforces the standing order to take care of Pool in case of problems. Bernhardt wrote this letter on July 21, 1999 indicating that "if Randy [Pool] doesn't give a statement, I'm not going to guarantee his safety from other people. There will not be anything I can do to help him. So he pretty much does not have a choice in the matter." This letter not only indicates that Bernhardt believed he was in a position to guarantee Pool's safety, but that his standing order that other people "take care" of Pool should be in fact carried out. There is no other reasonable hypothesis for this letter. Even though Pool may have been killed the day before the letter was written, there is no indication that Bernhardt knew of his death until

perhaps July 22, the date when Ecklund again visited Bernhardt in jail.

The thank you note sent to Ecklund by Bernhardt from jail on July 24, 1999, 4 days after Pool's murder, is also compelling evidence. This note provides any missing links and removes any reasonable doubt about Bernhardt's guilt. Bernhardt instructs Ecklund to "tell Sam, Lawrence and Ziek thank you for everything so far." The jury was aware of this note and that Bernhardt had been visited in jail by Ecklund on July 22, 1999, 2 days after Pool's murder. The note came 2 days after Ms. Ecklund's conversation with Bernhardt. The jury was also aware that Ecklund had been charged with Pool's murder, as it was discussed on the first part of Bernhardt's taped interrogation on August 6, 1999.

The majority has failed to view this whole picture in the proper context when arriving at its conclusion that the circumstantial evidence was insufficient to support a guilty verdict and that it is "impossible to conclude that the evidence points 'unerringly' to Bernhardt's guilt." The majority isolates individual pieces of evidence to support its reasoning that with respect to each piece of evidence there is a reasonable hypothesis other than guilt. However, "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Ostrem,* 535 N.W.2d 916, 923 (Minn. 1995). When there is credible circumstantial evidence of motive, opportunity, companionship and conduct before and after the offense, a person's participation and criminal intent could be inferred. *See Berndt,* 392 N.W.2d at 880. The chain of evidence, as a whole, leads directly to the guilt of Bernhardt so as to exclude, beyond a reasonable doubt, any reasonable hypothesis other than that of guilt.

The majority argues that I erringly "build[ ] most of [my] conclusion that the evidence was sufficient on the testimony of one witness, Randy Jaster." It further asserts that I "overstate[ ] the evidence" by pointing to the letter that Bernhardt wrote in order to thank his companions for their actions. The majoritys argument on these points attempt to assign weight to certain pieces of evidence and, in doing so, ignores our responsibility to leave to a jury the judgment as to the weight of a particular witness or piece of evidence. *State v. Rainer,* 411 N.W.2d 490, 495 (Minn.1987). I would instead follow our guidelines to ascertain whether any legitimate inferences of guilt exist in the record that could have lead the jury to a guilty verdict. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978). We must consider the evidence in the light most favorable to the verdict. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978). It is clear that legitimate inferences of guilt exist that point directly towards Bernhardt.

Short of an admission or confession, the chain of evidence is complete; from Bernhardt's initial anger for being snitched on, his desire, motivation and opportunity to find out who had snitched on him and taken his property, the discussion of snitches ending up dead, his standing order for retaliation against Pool in case of trouble, and his thank you note to the killers. Conduct before and after the incident fact can be considered in helping to meet the state's burden of proof. To impose liability for aiding and abetting, "active participation in the overt act that constitutes the substantive offense is not required, and a defendant's presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000). For the foregoing reasons, I believe the state has

met its burden. I would reverse and remand for a new trial rather simply than reverse Bernhardt's conviction.

PAGE, Justice, (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gilbert.

ANDERSON, PAUL H., Justice, (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gilbert.