*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-1367

State of Minnesota,
Respondent,

vs.

Isabella Anne Gendron,
Appellant.

**Filed June 17, 2024**
**Reversed**
**Smith, John, Judge**[*]

Olmsted County District Court
File No. 55-CR-21-7219

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Michael J. Spindler-Krage, Rochester City Attorney, Samuel T. Shabel, Assistant City
Attorney, Rochester, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant Public
Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Cochran, Presiding Judge; Ede, Judge; and Smith, John,

Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**SMITH, JOHN**, Judge

We reverse appellant Isabella Anne Gendron's conviction for third-degree driving while impaired (DWI)-refusal to submit to chemical testing, pursuant to Minn. Stat. §§ 169A.20, subd. 2(2), .26, subd. 1(b) (2020) because the trooper's statement to appellant that he had a warrant for blood or urine, followed by repeated requests for a blood sample, did not constitute an offer to take a urine test as required by the statute.

## FACTS

Shortly after midnight on November 24, 2021, a trooper observed a car driving 77 mph in a 35-mph zone and followed the car as it sped to over 100 mph in a 60-mph zone. The trooper initiated a stop and approached the car, which had only one occupant— appellant Isabella Anne Gendron. The trooper observed that Gendron's pupils were dilated and that she was talking quickly, grinding her teeth, and had heat bumps[1] on her tongue. Gendron disclosed that she was on probation for a controlled-substance offense and that she had been sober for a few days after using cocaine. The trooper conducted field testing and based on the results and his observations, he believed that Gendron was under the influence of a controlled substance and placed her under arrest for driving while impaired.

When they arrived at the jail, the trooper applied for and obtained a search warrant for a blood or urine sample and then presented the search warrant to Gendron. Throughout

---

[1] The trooper testified that "heat bumps" are red or white bumps that appear on the back of a person's tongue after inhaling or smoking something very hot, such as controlled substances.

most of the 90-second exchange, the trooper and Gendron spoke simultaneously. The trooper eventually managed to tell Gendron that he had a signed search warrant for a sample of her blood or urine. Gendron responded, saying, "I'm not doing sh-t. You can suck my d-ck with all that." The trooper then asked Gendron to go into another room "because we're gonna do a blood draw," to which Gendron replied, "No, we're not." The trooper again asked Gendron to come with him for a blood draw and she repeatedly stated, "I'm not doing nothing for you." The trooper advised her that failure to comply with a search warrant is a crime. Gendron continued to refuse the blood test, and the trooper noted that she refused all testing.

Respondent State of Minnesota charged Gendron with third-degree driving while impaired (DWI)-refusal to submit to chemical testing, pursuant to Minn. Stat. §§ 169A.20, subd. 2(2), .26, subd. 1(b) (2020). Gendron moved to dismiss the charge because the trooper did not offer a urine test when Gendron refused the blood test.

At the contested omnibus hearing, the trooper testified that he called a phlebotomist to the jail for a blood sample and that the phlebotomist was present when the trooper asked Gendron for the blood sample. Additionally, he testified that "[Gendron] said several times she wasn't going to give me anything I was asking for. She didn't use those terms, but she said several times she wasn't going to comply with the warrant or she wasn't going to give me anything. She said she'd sit in jail." He testified that Gendron did not provide any reason for him to believe that she would refuse only a blood test; "she didn't say she was scared of needles or didn't want to provide a blood sample because of the needle or anything, she just said she wasn't going to give me anything because I didn't have the right

to arrest her." However, the trooper acknowledged that he never specifically offered Gendron a urine test.

Gendron testified that she refused the blood test because she does not like needles and did not "feel like there was a need for it." Gendron testified that she saw the search warrant and that it authorized a blood test or a urine test, but that at the time she "didn't think once [the trooper] chose which test they wanted that you could pick" and that she "thought it was up to the [trooper] to decide which [test to provide]."

The district court denied Gendron's motion to dismiss the test-refusal charge because (1) a jury could reasonably find that the trooper's statement, "I have a signed search warrant for your blood or urine," informed Gendron that the test could be for blood or urine and (2) a jury could reasonably determine that Gendron's statement—"I'm not doing sh-t. You can suck my d-ck with all that"—was a refusal of all testing, and so the trooper did not need to offer anything more.

The case proceeded to a stipulated-evidence trial, and the district court found Gendron guilty of third-degree DWI-test refusal, entered the judgment of conviction, and sentenced her pursuant to the stipulation.

**DECISION**

Gendron argues that the district court erred when it denied her motion to dismiss the DWI-test-refusal charge because (1) the trooper was required to offer both blood and urine tests so that she might refuse each before she could be charged and convicted of test refusal under Minn. Stat. § 169A.20, subd. 2(2), and (2) her general noncompliance with the trooper's orders does not constitute refusal of both a blood and a urine test and that the

4

trooper's single mention of the word "urine" when he presented her with the search warrant does not constitute an offer for a urine test instead of a blood test. We resolve this case on Gendron's first argument, so we need not reach her second.

Due process requires that the state prove beyond a reasonable doubt every fact and element necessary to convict the defendant of the crime charged. *State v. Hage*, 595 N.W.2d 200, 204 (Minn. 1999). The state charged Gendron with violating Minnesota Statutes section 169A.20, subdivision 2(2). The statute says, "[i]t is a crime for any person to refuse to submit to a chemical test . . . of the person's blood or urine as required by a search warrant under sections 171.177 and 626.04 to 626.18." Minn. Stat. § 169A.20, subd. 2(2). Section 171.177 requires an officer to inform the person that test refusal is a crime, and explicitly states that "[a]ction may be taken against a person who refuses to take a blood test only if a urine test was offered and action may be taken against a person who refuses to take a urine test only if a blood test was offered." Minn. Stat. § 171.177, subds. 1-2 (2020). Therefore, to prove the crime of test refusal, the state must prove that (1) the person refused to submit, (2) to a chemical test of their blood or urine, (3) as required by a valid search warrant, (4) an officer informed the person that refusal is a crime, and (5) an officer offered a blood or urine test and, if refused, offered the other. Minn. Stat. §§ 169A.20, subd. 2(2), 171.177, subds. 1-2.

Whether a defendant's conduct meets the definition of a particular offense presents a question of statutory interpretation that we review de novo. *State v. Hayes*, 826 N.W.2d 799, 803 (Minn. 2013).

5

Although the parties' briefs present this issue as a review of the district court's probable-cause determination, this court conducts a sufficiency-of-the-evidence review because the district court already entered a judgment of conviction. *See State v. Holmberg*, 527 N.W.2d 100, 103 (Minn. App. 1995) (explaining that although the defendant challenged probable cause, this was an irrelevant argument because the district court entered a conviction), *rev. denied* (Minn. Mar. 21, 1995).

"[Appellate courts] use the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence." *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). When performing a sufficiency-of-the-evidence review, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). A conviction will not be reversed "if [a] jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004) (quotation omitted).

The standard of review applied to the evidence depends on whether direct or circumstantial evidence supports the element challenged on appeal. *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010) ("A conviction based on circumstantial evidence receives stricter scrutiny than a conviction based on direct evidence."). "[D]irect evidence is evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn.

6

2017) (quotation omitted). Here, we need only review direct evidence—the search warrant and the recorded conversation.

Pursuant to our de novo review, we determine that the state did not prove that the trooper offered Gendron a urine test, and therefore the final element of the charge is not met. Minnesota Statutes section 171.177, subdivision 2, incorporated into the charging statute, clearly states that a test refusal has not occurred unless an officer offers the person both a blood test and a urine test.

> The peace officer who directs a test pursuant to a search warrant shall direct a blood or urine test as provided in the warrant. If the warrant authorizes either a blood or urine test, the officer may direct whether the test is of blood or urine. If the person to whom the test is directed objects to the test, the officer shall offer the person an alternative test of either blood or urine. Action may be taken against a person who refuses to take a blood test only if a urine test was offered and action may be taken against a person who refuses to take a urine test only if a blood test was offered.

Minn. Stat. § 171.177, subd. 2; s*ee also Nash v. Comm'r of Pub. Safety*, 4 N.W.3d 812, 816 (Minn. 2024) (recognizing that Minnesota Statutes section 171.122, subdivision 2 "says that if the person refuses the type of test the officer initially offers (blood or urine), action may not be taken against the person for test refusal unless the person is also offered and refuses to take the other type of test").

The evidence here demonstrates that the trooper informed Gendron that he had a search warrant for her blood or urine and that a phlebotomist stood nearby. There is no indication in the recording of the conversation that the trooper ever told Gendron that she could choose to provide a urine sample instead of a blood sample or that a urine test could

be made available. Rather, he continued to ask her to go to the room next door so that the phlebotomist could obtain a blood sample. The only meaningful engagement Gendron had with the trooper was when she refused his request to go next door for the blood draw. The facts do not indicate that the trooper ever offered Gendron an alternate test (urine test) or gave her the choice between a urine or a blood test.

A review of the caselaw also demonstrates that an officer stating that they obtained a warrant for blood or urine is not an offer under the statute.[2] Gendron points us to a previous opinion from our court, *State v. Hammann*, No. A11-1322, 2012 WL 3023337 (Minn. App. July 23, 2012), *rev. denied* (Minn. Oct. 16, 2012).[3] In *Hammann*, we reversed a DWI-test-refusal conviction because, although the officer said the sample could be blood or urine and the defendant proceeded to ask questions of the officer, ultimately the officer said, "If you won't do urine, we're gonna ask you do blood and that's it," and we determined that this statement did not create "an offer for alternative testing." *Id.* at *1-4. Gendron's case presents facts that are even less supportive of a determination that the trooper provided Gendron with an offer for alternative testing. Like *Hammann*, the trooper

---

[2] The cases relied on in this opinion predate the substantive changes to Minn. Stat. § 169A.20, subd. 2(2), that happened in 2017, which added a warrant requirement for a blood or urine test. *See State v. Rosenbush*, 931 N.W.2d 91, 96-97 (Minn. 2019) (explaining the legislative change that now requires blood and urine samples be obtained only pursuant to a search warrant); *Johnson v. State*, 916 N.W.2d 674, 684 (Minn. 2018) (holding that the warrant requirement is a substantive change to the law for the purpose of retroactive application). Cases predating this change are instructive to our analysis of the offer element because that requirement remains unchanged but should not be cited with respect to the warrant requirement.

[3] "Nonprecedential opinions . . . may be cited as persuasive authority." Minn. R. Civ. App. P. 136.01, subd. 1(c).

only mentioned the alternative test once, which occurred at the beginning of the interaction; but unlike *Hammann*, the trooper here only stated that he had a warrant for blood or urine, not that Gendron could choose a urine test. Furthermore, he spoke with Gendron while a phlebotomist stood behind him and never indicated that he had the supplies for a urine test. We determine that the facts of this case are so dissimilar from *Hammann* that it is even less reasonable to conclude that the trooper offered Gendron a urine test or a choice between the two tests.

The state and the district court relied on reasoning from two other cases from this court, *State v. Urban*, No. A08-1316, 2009 WL 2151130 (Minn. App. July 21, 2009), *rev. denied* (Minn. Oct. 20, 2009), and *State v. Hagen*, 529 N.W.2d 712 (Minn. App. 1995). In *Urban*, we affirmed a test-refusal conviction because the officer's reading of the implied-consent advisory, which the defendant acknowledged that he understood, satisfied the offer element. 2009 WL 2151130, at *3. The facts of Gendron's case are similar to the extent that there was only one mention of the blood or urine test at the beginning of her interaction with the trooper—but this is where the similarities end. In *Hagen*, we affirmed the defendant's DWI-test-refusal conviction "because the deputy initially offered Hagen a choice of either test," and the defendant's continued silence amounted to a refusal. 529 N.W.2d at 713-14. The defendant continued to remain silent while the officer repeated the offer two more times. *Id.* at 713. The facts in Gendron's case are drastically different— because the trooper never offered a urine test in the first place, Gendron had no opportunity to refuse.

Thus, because the trooper did not offer Gendron a test of her urine rather than her blood as required by the statute, the evidence is insufficient to support Gendron's DWI-test-refusal conviction.

**Reversed.**