STATE of Minnesota, Respondent,

v.

Coley Javar GATES, Appellant.

No. C9–99–1340.

Supreme Court of Minnesota.

Aug. 3, 2000.

Robert D. Miller, Robert D. Miller & Associates, Minneapolis, John G. Westrick, Westrick & McDowall–Nix, PLLP, St. Paul, for the appellant.

Mike Hatch, Attorney General, St. Paul, Amy Klobuchar, Paul R. Scoggin, Hennepin County Attorneys, Minneapolis, for the respondent.

## OPINION

RUSSELL A. ANDERSON, Justice.

We review the conviction of appellant, Coley Javar Gates, who was sentenced to life imprisonment for aiding and abetting first-degree murder in violation of Minn. Stat. §§ 609.05, 609.185(1) (1998). Gates argues that the trial court erred by admitting into evidence hearsay statements of the decedent victim and that the evidence was insufficient to establish his guilt. He also argues that the trial court erred by its instructions to the jury, that the state violated discovery rules, and that the prosecutor engaged in misconduct that warrants a new trial. We affirm.

On June 13, 1998, at approximately 4:30 in the afternoon, Chauncey Teasley was shot to death near the Parkview Apartments complex in Minneapolis. A single .45–caliber bullet entered his left arm, went into his chest, through his left lung, through his aorta and came to a stop in his right lung. Seven .45–caliber shell casings and one .45–caliber bullet were found on both sides of a fence several yards west of where Teasley was found. The murder weapon was never found and, although witnesses testified that they heard more than seven gunshots and that some of the shots sounded different from the others, there was no physical evidence suggesting that there was a second firearm.

A trail consisting of a blood-like substance ran from the fence to where Teasley finally fell. A cellular phone was found near the casings. Secundus Ray's[1] girlfriend had given Ray the phone approximately a month before Teasley was shot.

No more than 1½ to 3 minutes before the shooting, Gates and Teasley were involved in a confrontation in front of one of the buildings in the Parkview complex. Teasley was at the building to visit a friend he had not seen for several years, Depring Jackson. Teasley arrived shortly before the confrontation in a maroon Cadillac driven by his cousin, Howard Nelson, and in which another cousin, "Nobby" Teasley, and Nelson's infant daughter were also passengers. Nelson parked the Cadillac in the building parking lot near the front entry.

Jackson and her sister met Teasley at the front of the building. Soon thereafter, Gates drove his red Ford Taurus into the building parking lot. Gates and his passenger, Ray, got out of the Taurus and walked toward the front entry, where Teasley was standing. According to witnesses, Gates and Teasley had an "angry" exchange, a "confrontation." Gates said to Teasley, "You remember me; you shot at me back in the day." According to Jackson, Teasley's "eyes got big and he ran." Before fleeing, Teasley told his cousins in the Cadillac, "I think he gonna get me" or "I think they gonna get me," "I got to go," and "Man, that's that dude C.K. that I got into it with." Teasley ran toward the south corner of the apartment building. Jackson went to the Cadillac and told Teasley's cousins, "just get him and take him home." Gates and Ray returned to the Taurus and, as Nelson drove the Cadillac from the parking lot, Gates followed very closely in the Taurus.

As Nelson drove south, the direction in which Teasley had fled, he and Nobby saw Teasley off to their right running in a wooded area south of Parkview Apartments. Gates continued to follow the Cadillac, but at some point turned in the direction Teasley was seen running. According to Nelson, Gates turned onto a gravel road leading to the wooded area behind the fence line. Jackson and her sister watched the cars exit the parking lot and began pursuing Teasley on foot, and when they reached the south corner of the next apartment building, they saw him running in a field and then heard a series of shots. They ran toward the

---

1. Ray, Gates' companion, was convicted of the first-degree murder of Teasley approximately six months after Gates' trial ended.

sound of the shots and heard another series of shots. A security guard who had witnessed the confrontation between Gates and Teasley also heard shots and ran toward the sound. He testified that he heard the shots approximately 1½ to 3 minutes after seeing the cars leave the parking lot. The security guard reached Teasley who was lying on the ground, fatally shot, and moments later Jackson and her sister also reached the spot where Teasley lay. The security guard heard rustling coming from the wooded area.

Two residents of the apartment building behind Jackson's and closer to the wooded area testified at trial. They heard shots being fired, looked outside and saw Teasley fall. They also saw a light complexioned, short-haired African–American male, wearing a white and blue jacket, blue baggy shorts, and white shoes flee from the scene, running northeast, but they did not see where he went or whether he got into a car. The defense asserted in opening and closing statements that the fleeing individual was the shooter and that the shooter was Secundus Ray.

Gates did not testify at trial but his conflicting statements to police following the shooting were received as evidence. Six days after the shooting, Gates told police that he had arrived alone at the Parkview Apartments on the afternoon of the shooting to see his girlfriend who lived there. As he approached the building, a female voice from an apartment above called to him that his girlfriend was not there. He told police that he left to look for her and that when he returned, he went to her apartment and she was there.[2] He learned that there had been a shooting in the area. Gates and his girlfriend decided to go to a movie. Gates told police that as he drove with his girlfriend from the apartment parking lot, he followed a burgundy or red Cadillac. He later admitted that he had followed the Cadillac earli-

er, when leaving the parking lot to look for his girlfriend, not when he and his girlfriend later left for the movie.

Ten days after his first statement, Gates again told police that he was alone when he first left the parking lot to look for his girlfriend, but later admitted that another individual was with him. He identified the individual as "Reese," and told police where Reese lived. He said that Reese approached him in the parking lot and asked for a ride to a mall. He told police that he dropped "Reese" off a short distance away. At trial, Gates' cousin, Jerise Washington, testified that he was known as "Reese," that he lived in the area where Gates told police "Reese" lived, and that he was not with Gates at all on the day of the shooting.

**I.**

■ Appellant claims his rights under the Confrontation Clause were violated by the court's admission, over defense objection, of Teasley's statements to his cousins: "I got to go," "[T]hat's that dude C.K. that I got into it with" and "I think they gonna get me" or "I think he gonna get me." The United States and Minnesota Constitutions protect the right of the accused to confront the witnesses against him. U.S. Const. amend. VI; Minn. Const. art. I, § 6. While the interests protected by the Confrontation Clause reflect core values, face-to-face confrontation is not an absolute right, and we have held that the admission of hearsay under a firmly-rooted exception does not violate the accused's right of confrontation. *See State v. Salazar,* 504 N.W.2d 774, 777 (Minn.1993); *State v. Larson,* 472 N.W.2d 120, 125 (Minn.1991).

■ The state sought to admit Teasley's statements under the excited utterance exception to the hearsay rule, Minn. R. Evid. 803(2). The excited utterance exception is

---

2. A security videotape of the apartment entrance did not show Gates entering the apartment building that day.

firmly rooted for purposes of Confrontation Clause analysis. *See State v. Daniels,* 380 N.W.2d 777, 785–86 (Minn.1986). Therefore, if the statements were admissible under the exception, Gates' right of confrontation was not violated.

■ Evidentiary rulings are generally left to the sound discretion of the trial court and we review such rulings only for abuse of discretion. *See State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). For a statement to be admitted under the excited utterance exception to the hearsay rule, there must have been a startling event or condition, the statement must relate to the event or condition, and the statement must be made under the stress caused by the event or condition. *See State v. Edwards,* 485 N.W.2d 911, 914 (Minn.1992); Minn. R. Evid. 803(2).

Gates argues that his statement to Teasley, "you shot at me back in the day," refers to a past event, too remote to be the predicate startling event. The startling event was the recognition of Gates, however, and not the past event. Gates also argues that his statement was not a threat to Teasley. Even if Gates' statement was not a threat to Teasley, it is startling to be confronted by someone who claims that you once fired a gun at him. That Teasley was actually alarmed by the sight of Gates is supported by evidence that his eyes got big when he recognized Gates and he fled.

■ Gates also argues that Teasley's statement, "that's that dude C.K. that I got into it with," relates to a past event and thus cannot qualify as an excited utterance. The statement, however, is a contemporaneous identification of Gates as a person with whom Teasley had a previous confrontation and whom he had just recognized. The fact that Teasley ran immediately after this and his other statements supports the finding that Teasley was excited by the encounter. We conclude that the trial court did not abuse its discretion by admitting Teasley's state-

ments into evidence as excited utterances excepted from the hearsay rule.

## II.

■ The second issue is whether the evidence was sufficient to support the verdict. Gates argues that the wholly circumstantial evidence is insufficient to prove beyond a reasonable doubt that he aided and abetted Ray in the murder of Teasley. Specifically, Gates argues that the evidence is insufficient to prove beyond a reasonable doubt that he knew Ray intended to shoot Teasley and that he intended to help Ray.

■ To impose liability for aiding and abetting, the state must show that the defendant played a knowing role in the commission of the crime. *See State v. Ostrem,* 535 N.W.2d 916, 924 (Minn.1995). We distinguish between, on the one hand, a knowing role in the crime and, on the other hand, mere presence at the scene, inaction, knowledge and passive acquiescence. *See id.* However, active participation in the overt act that constitutes the substantive offense is not required, and a defendant's presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent. *See id.*

■ There is no question that the conviction here rests on circumstantial evidence. A conviction based on circumstantial evidence will be upheld if the reasonable inferences drawn from the evidence are inconsistent with any rational hypothesis except that of the defendant's guilt. *See State v. Anderson,* 379 N.W.2d 70, 78 (Minn.1985). We look at the record " 'to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did.' " *State v. Tovar,* 605 N.W.2d 717, 726 (Minn. 2000) (quoting *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989)). The evidence must form a complete chain that leads directly

to the defendant's guilt and makes any other theory unreasonable. *See Ostrem*, 535 N.W.2d at 923. To succeed in a challenge to a conviction based upon circumstantial evidence, a convicted person must point to evidence within the record that is consistent with a rational theory other than guilt. *See id.* However, "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *Id.*

Gates claims that the evidence presented was consistent with a theory other than guilt; namely, that Gates merely followed the Cadillac out of the parking lot and proceeded some undetermined distance before dropping Ray off, at which point Gates went on his way. However, the defendant's alternate theory consistent with a finding of not guilty must be rational. *See id.* The theory Gates submits is not rational, however, in light of the physical and testimonial evidence. In opening statement and in closing argument, the defense maintained that Ray was the shooter seen fleeing from the wooded area. The physical evidence (cell phone and bullet casings) place the shooter (Ray) near the fence where Teasley fell. The testimonial evidence also demonstrated that the shots were fired a very short time after the cars left the parking lot. The security guard testified that the amount of time was just 1½ to 3 minutes. Jackson testified that she watched the cars leave the parking lot, began running after Teasley, and heard shots as she neared the corner of the next apartment building. Therefore, Ray was able to get from the parking lot to the fence line where the shell casings and cell phone were found in a very short period of time. Ray was last seen getting into a car driven by Gates. Nelson provided testimony that the Taurus was last seen turning onto a gravel road that leads to the wooded area behind the fence line. The only rational inference from the evidence is that Gates intentionally transported Ray to a point close to the fence so that Ray could shoot Teasley.

The fact that Gates was driving the car, his physical and temporal proximity to Ray, the shooter, and to the victim, Teasley, and his inconsistent statements to the police, provide sufficient evidence of presence, companionship and conduct to support the verdict that Gates aided and abetted the first-degree murder of Teasley. Because the theory Gates posits is contradicted by the physical and testimonial evidence, and because the circumstantial evidence leads directly to Gates' guilt, the evidence was sufficient to convict.

### III.

The third issue is whether the trial court properly instructed the jury. Absent an abuse of discretion, the trial court's refusal to give a requested jury instruction will not be reversed. *See State v. Daniels*, 361 N.W.2d 819, 831 (Minn. 1985). Gates first argues that the trial court abused its discretion in denying his request that the jury be instructed that proof beyond a reasonable doubt means "an abiding conviction amounting to a moral certainty." We have allowed a jury to be so instructed but we have noted that the "moral certainty" language may suggest a higher burden of proof for the state. *See State v. Moorman*, 505 N.W.2d 593, 605 (Minn.1993). However, we decline to require courts to instruct juries that a "moral certainty" is required. Accordingly, the trial court's instruction was not an abuse of discretion.

The trial court also denied Gates' request that the jury be instructed that in order to find Gates guilty of aiding and abetting, the jury must first find that Gates aided and abetted the intended crime. Under Minnesota law a person may be liable for aiding and abetting another in the commission of a crime even if the crime committed is not the intended crime but another crime that was a foreseeable and probable consequence of the attempt to commit the intended crime. *See* Minn.Stat. § 609.05. The trial court

therefore instructed the jury in accordance with the law.

■ Gates proposed that the jury be instructed that mere presence at the scene of a crime or knowledge that the crime is being committed is insufficient to prove guilt. While this is a correct statement of law, the trial court relied upon language in the standard jury instruction providing that the defendant aids and abets a crime "when the defendant has intentionally aided the other person in committing [the crime], or has intentionally advised, hired, counseled, conspired with, or otherwise procured the other person to commit it." 10 Minnesota Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 4.01 (4th ed.1999). We see no abuse of discretion in relying on the standard language.

■ The trial court also denied Gates' request that the jury be instructed that circumstantial evidence "may be of the highest and most conclusive kind of proof, but in order to reach a conclusion beyond a reasonable doubt on circumstantial evidence alone, all circumstances proved must be consistent with that conclusion and inconsistent with any other rational conclusion." Such an instruction is not required, *see State v. Gassler,* 505 N.W.2d 62, 68 (Minn.1993), as we have made plain that instructing on direct and circumstantial evidence with an instruction on proof beyond a reasonable doubt is sufficient, *see State v. Turnipseed,* 297 N.W.2d 308, 312–13 (Minn.1980). Indeed, the United States Supreme Court has held that to read a sufficiency of circumstantial evidence test to the jury "is confusing and incorrect." *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The trial court properly instructed the jury.

## IV.

■ The fourth issue is whether Gates is entitled to a new trial because of the state's alleged violations of the rules governing discovery. Gates alleges that the prosecutor failed to disclose (1) an audiotape of a statement Gates made to the police; (2) a videotape containing footage of the entryway to the apartment building; (3) information about possession of the cellular phone found near the shell casings; and (4) Nelson's statements regarding what Teasley said to him after the confrontation with Gates.

■ The criminal rules require the prosecuting attorney to allow the defense access to "all matters * * * which relate to the case." Minn. R.Crim. P. 9.01, subd. 1(7). Failure to disclose material evidence also violates due process. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence is material where there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Under the Minnesota Constitution, we have refused to grant a new trial where the undisclosed evidence could not in any reasonable likelihood have affected the judgment of the jury. *See State v. Poganski,* 257 N.W.2d 578, 579–80 (Minn.1977).

The audiotape of Gates' statement was delivered to the defense approximately five months before trial. However, the recorder used to tape the interview, which recorded both video and audio, had malfunctioned. The officer who conducted the interview assumed, incorrectly, that because the video did not record, the audio had not recorded as well. Defense counsel was the first to discover that the tape did contain an audio of Gates' statement. However, there is no indication that the discovery came so close to trial that the defense was unable to prepare for its admission or alter its trial strategy accordingly. Likewise, the unedited, full-length security videotape of the apartment building was provided to the defense before trial and the admission of an edited version was therefore not new evidence. Simply

put, there was no nondisclosure with respect to these pieces of evidence. Similarly, information concerning the cellular phone found near the shell casings was disclosed to the defense well in advance of trial and Gates fails to explain how he was prejudiced by not knowing that the state actually possessed the cell phone.

Finally, Gates alleges that the prosecutor failed to disclose additional information that Nelson revealed through testimony. The defense argued that in the only statement of Nelson's that they had been provided with prior to trial, Nelson told police that he did not hear Teasley say anything when Teasley returned briefly to the Cadillac before running. On direct examination, the prosecutor asked Nelson, "What did he say?" suggesting the prosecutor knew Nelson would testify that he heard Teasley say something, contrary to his earlier statement to police. The prosecutor admitted that when reviewing the security videotape with Nelson the witness told him he heard Teasley say something like, "I got to go." The prosecutor claimed that he did not know Nelson would testify that Teasley said, "Man, that's that dude C.K. that I got into it with." Gates alleges that this nondisclosure was significant because it was the first evidence of motive the jury heard.

The trial court did not make a finding as to whether the prosecutor knew that Nelson would testify that Teasley said, "Man, that's that dude C.K. that I got into it with." However, the court did rule that the prosecutor should have disclosed to the defense the substance of his conversation with Nelson. The court determined that the appropriate remedy was to allow the defense to recall Nelson for additional cross-examination if the defense felt it necessary.

■■■ The trial court is well suited to determine the remedy for a discovery violation. *See State v. Freeman,* 531 N.W.2d 190, 197–98. Cross-examination is particularly appropriate here because the defense was aware that other potential witnesses were prepared to provide motive evidence. Specifically, Jackson later testified that Gates said something to the effect of, "You remember me—you shot at me back in the day." In addition, the trial court found and we agree that the defense vigorously cross-examined Nelson regarding inconsistencies in his statements to the police and his testimony and attempted to impeach him by introducing his prior felony convictions. We conclude that the trial court's ruling providing for additional cross-examination to remedy the discovery violation was not an abuse of its discretion.

## V.

■■■ The last issue is whether Gates is entitled to a new trial because of prosecutorial misconduct. Gates argues that the prosecutor made improper remarks during opening statement and during closing argument that constitute prosecutorial misconduct entitling him to a new trial. We generally will not grant a new trial if the misconduct was harmless beyond a reasonable doubt. *See State v. Atkins,* 543 N.W.2d 642, 648 (Minn.1996). We determine whether prosecutorial misconduct is harmless based in part on the type of misconduct. *See State v. Caron,* 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974). If the prosecutorial misconduct is serious, it will be deemed harmless beyond a reasonable doubt if we are sure the verdict rendered was unattributable to the error. *See State v. Ashby,* 567 N.W.2d 21, 28 (Minn.1997). If the misconduct is less serious, the verdict will be affirmed so long as the misconduct did not likely play a substantial part in influencing the jury to convict. *See Caron,* 300 Minn. at 128, 218 N.W.2d at 200. Gates argues that the prosecutor's statements were an attempt to "inflame the jury's passions and prejudices against the defendant," citing *State v. Porter,* 526 N.W.2d 359 (Minn.1995). The statements in this case do not rise to the level of those in *Porter,* where the prosecutor told the jury that they would be "suckers" if they believed a defense wit-

ness and that they would need a sedative if they acquitted. *Id.* at 363. First, the prosecutor said in his opening statement, "[T]ruth is something you use when you run out of excuses." While the trial court found this statement to be argument and therefore improper for opening statement, its meaning is not readily apparent. It seems more likely to confuse than to inflame. Next, in closing argument, the prosecutor said, "The goal of pure justice is a verdict that confirms the truth. You folks are the finders of fact. The goal for you is to look for the truth in the evidence." We find nothing in this statement improper. The prosecutor asked the jury to look to the evidence and reminded them of their role as fact finders.

■ The prosecutor also stated in closing, "But everyone loses if the persons responsible are not held accountable. And what we ask you to do * * * is we ask you to render a verdict that is fair and just. One that is a confirmation of the truth." The prosecutor's statement regarding accountability does not approach the level of argument we found improper in *State v. Montjoy,* 366 N.W.2d 103, 108–09 (Minn. 1985), where the prosecutor essentially asked the jury to teach the defendant a lesson. Based on the record as a whole, we find no misconduct and conclude that the trial court did not abuse its discretion in denying Gates a new trial.

We conclude that the victim's statements were admissible as excited utterances, that the evidence was sufficient to support Gates' conviction and that neither the trial court's instructions, the state's discovery violation nor the prosecutor's conduct entitle Gates to a new trial.

Affirmed.