STATE of Minnesota, Respondent,

v.

Anthony John PALUBICKI, Appellant.

No. A04–1318.

Supreme Court of Minnesota.

July 28, 2005.

John M. Stuart, State Public Defender, Steven P. Russett, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Gregory D. Larson, Hubbard County Attorney, Hubbard County Courthouse, Park Rapids, MN, for Respondent.

## OPINION

PAGE, Justice.

Appellant Anthony John Palubicki was indicted by a Hubbard County grand jury for one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2004) and two counts of first-degree felony murder in violation of Minn.Stat. § 609.185(a)(3) (2004) in connection with the January 25, 2003, death of Lorentz Olson. After a jury trial, Palubicki was convicted as charged and sentenced to life in prison for each of the three judgments of conviction. He also was ordered to pay a $200 public defender co-payment.

In this appeal, Palubicki argues that: (1) the trial court committed reversible error by admitting testimony about his conduct and statements on the night of the murder as observed and heard by his former wife without first determining whether evidence of the conduct and statements was protected by the marital privilege; (2) the trial court violated his constitutional right to present a defense by excluding "alternative perpetrator evidence" allegedly involving his former wife; (3) the trial court committed reversible error by refusing to instruct the jury that his former wife was an accomplice; (4) the trial court denied him a fair trial when it erroneously admitted character evidence; (5) prosecutorial misconduct during discovery and the trial denied him a fair trial; (6) the trial court erred by entering separate adjudications and sentences for each of his first-degree murder convictions; and (7) the trial court erred by ordering him to make a $200 public defender co-payment without a finding of his ability to pay. We affirm the convictions and remand for re-adjudication of the convictions and sentencing.

On January 25, 2003, 90–year–old Lorentz Olson was found dead in his Park Rapids, Minnesota, home by his son, Kim Olson. When police officers arrived, they found Lorentz Olson lying in bed, covered with a blanket, and with a pillow over his head, and blood spatter on the bedroom walls and ceiling. There was no evidence of forced entry into the home and nothing seemed to be missing. A neighbor had seen Olson alive at 7:30 p.m. the night before the day he was found dead, and another neighbor was awakened by a noisy car late that night. An autopsy determined that Olson died from multiple blunt-force trauma to his head.

After an initial investigation, the police had no suspects. At some point in May 2003, Joy Cantrell, the wife of appellant Anthony Palubicki, told her father that on the night of Olson's murder Palubicki had come home with blood on his clothes, was angry, stated that things had not gone well, and then washed his bloody clothes. Cantrell's father, a former police officer, advised Cantrell to tell the police what had happened, which she did on May 13, 2003.

Based on the discussions with Cantrell, the Olson murder investigation began to focus on Palubicki and his friend, Scott Fix. Fix, when interviewed by the police, initially denied involvement in Olson's murder and provided the police with an alibi. When challenged, Fix admitted being involved in the murder and implicated Palubicki. Fix indicated that Palubicki had planned to rob Olson and take Olson's car and that he had accompanied Palubicki as a lookout. Palubicki and Fix evidently wanted to use Olson's car for a different robbery. According to Fix, they drove to Olson's house in Fix's truck, which had a loud muffler, and parked about 300 feet away behind St. Joseph's Hospital. They walked from the truck to Olson's garage and entered the garage from a back door that was partially ajar. Fix remained in the garage as a lookout while Palubicki went inside the house. From his vantage point in the garage, Fix could see Palubicki roaming around parts of the house. Fix said that he heard what he variously described as "thud sounds," "twigs breaking," and "bones crunching." When Palubicki returned to the garage, he handed Fix a hammer, which was slippery and difficult to hold. Palubicki then reentered the house. After a while, Fix heard "gargling sounds."

Fix testified that when he and Palubicki eventually left Olson's house, they returned to Fix's truck and, following Palubicki's directions, Fix drove to a bridge over the Potato River where Palubicki disposed of the hammer. Fix directed the police to the bridge, but no hammer was found. Fix also led the police to a fire pit near his father's house where, according to Fix, he and Palubicki burned clothes they had worn on the night of the murder. Although he originally told the police that Palubicki was wearing "Carhartt" overalls that night, at trial he testified that the overalls might be "Dickie" and not "Car-

hartt." Fix also wore Carhartt overalls the night of the murder. In the fire pit, the police found debris, including pieces of burned fabric, snaps, zippers, buckles, steel toes from shoes or boots, and buttons, some of which were Carhartt buttons. Fix eventually pled guilty to second-degree intentional murder and testified for the state at Palubicki's trial. Except as noted, Fix's trial testimony was consistent with his statement to the police.

Cantrell also testified at Palubicki's trial. She did so over Palubicki's assertion of the marital privilege. According to Cantrell's testimony, one month before the murder, Palubicki gave Olson a ride home to get a spare set of car keys after Olson had locked himself out of his car outside a bar and, about a week before Olson's murder, she had overheard Palubicki and Fix talking about stealing a car from an "old man." She understood the "old man" to be Olson. On the night of the murder, Palubicki and Fix, who had been out drinking earlier that evening, continued drinking at Palubicki's house in Cantrell's presence. Cantrell heard them planning to rob Olson, but took no action to stop the robbery. When Palubicki and Fix left the house, Palubicki was wearing jeans and tennis shoes and carrying his Carhartt overalls. Sometime after she went to sleep, Cantrell was awakened by Palubicki's return home. According to Cantrell, she heard the front door slam and Palubicki pounding down the hallway toward the bedroom screaming "something about things getting fucked up." When he entered the bedroom and turned on the light, Cantrell saw blood-like spatters on Palubicki's face, wrists, and shoes. She also saw him take off his clothes and take them to the room where their washing machine was, and then she heard the washing machine's lid close and the machine being turned on. The next day, she learned of Olson's murder. When

Fix came to their house later that day, Cantrell overheard Fix say that he had driven by the hospital to see what was happening at Olson's house. Cantrell testified that Palubicki responded by calling Fix an "idiot" and "yelled at him for going back to the scene of the crime." She also heard Palubicki say that he "did what he had to do" and "the old man deserved it anyway." In addition, she heard Palubicki and Fix talk about burning clothes, which Fix agreed to do. Four or five days later, Cantrell heard Palubicki telling Fix that he was an "idiot" for not getting rid of the clothes as he had been told to do. Palubicki then said that he would burn the clothes himself and, according to Cantrell, she never again saw the tennis shoes that Palubicki wore or the Carhartt overalls that he carried the night of the murder. Although Fix testified that Cantrell was with Palubicki and Fix when they burned the clothes, Cantrell denied being present. She also denied asking Palubicki whether he got any money, which conflicted with Fix's testimony. Finally, although she testified that she did not go to the police sooner because she was afraid, Cantrell admitted that before trial she had asked about a reward offered in connection with Olson's murder.

Two forensic scientists testified at trial that the position of Olson's body suggested that Olson had been lying down when he was killed and that the absence of blood spatter on a wall suggested that the killer had been standing between the wall and the bed at the time of the murder. The medical examiner who performed the autopsy testified that a hammer, similar to one that Fix described Palubicki as having at Olson's house, matched Olson's head wounds "fairly well." The medical examiner further testified that Olson most likely was struck by somebody using his right hand. Palubicki is right-handed, while Fix is left-handed. Palubicki did not testify at

trial. The only defense witness was a police investigator who testified that a search of Palubicki's house produced nothing of evidentiary value.

Over defense objection, the trial court excluded evidence related to a robbery at Petro Pete's, a gas station and convenience store where Cantrell worked, which occurred two days after Olson's murder while Cantrell was on duty, as well as a statement by Fix's brother that Fix had threatened to start killing people sometime during the week after Olson's murder. The trial court also denied Palubicki's request for an accomplice jury instruction with respect to Cantrell.

The jury found Palubicki guilty of one count of first-degree premeditated murder and two counts of first-degree felony murder. The trial court entered separate adjudications and life sentences for all three counts of first-degree murder. This appeal followed. For the reasons discussed below, we affirm Palubicki's convictions and remand to the trial court for the readjudication of the convictions and sentencing.

## I.

First, we address Palubicki's claim that the trial court committed reversible error when it allowed Cantrell and her father to testify about what Cantrell heard Palubicki say and observed him do when he came home the night Olson was murdered without first determining whether the purported communications were protected by the marital privilege. The availability of a privilege is an evidentiary ruling to be determined by the trial court and reviewed on appeal for an abuse of discretion. *State v. Gianakos,* 644 N.W.2d 409, 415 (Minn.2002). With respect to the marital privilege, Minn. Stat § 595.02, subd. 1(a) (2004), provides in relevant part:

A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage.

Thus, the statute provides two distinct privileges: (1) the privilege to prevent a spouse from testifying against the other during the marriage; and (2) the privilege to prevent a spouse from testifying at any time concerning confidential interspousal communications made during the marriage. *Gianakos*, 644 N.W.2d at 416. In this case, because Cantrell's divorce from Palubicki became final before the trial, only the confidential interspousal communication privilege is at issue.

■ We have defined the word "communication," as used in Minn.Stat. § 595.02, subd. 1(a), to include "all written or spoken words, acts, and gestures which were intended by one spouse to convey a meaning or message to the other—such communication usually being denominated assertive conduct." *State v. Hannuksela*, 452 N.W.2d 668, 676 (Minn.1990). In doing so, we recognized that it would not always be clear whether an act or gesture was intended to be an assertive communication. We said:

> In some cases—those in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are other indications that he *intends* for her to acquire knowledge of his act—the act is as much a communication as his words to her describing the act would be. Such an act falls within the policy of the privilege. In other cases, however—those in which the act is done *solely for the sake of doing it*, the indications being that the husband is *indifferent* to the presence of

the wife—there is no communication and the marital confidence aspect of the act is likely to be slight. In such cases the privilege should not be allowed to deprive the court of the evidence.

*Id.* at 677 (quoting VIII J. Wigmore, *Wigmore on Evidence*, § 2337 at 658 (McNaughton rev.1961)) (emphasis added). The burden of proving the applicability of the marital privilege rests on the spouse who invokes the privilege. *State v. Martin*, 293 Minn. 116, 124–25, 197 N.W.2d 219, 225 (1972).

Palubicki argues that the scope of privileged communications includes his alleged statements to Fix that Cantrell claimed to have heard, as well as Palubicki's statements and conduct upon returning home on the night of the murder. He bases this argument on his contention that, when viewed in the context of Cantrell's statement to the police, portions of which were excluded by the trial court as privileged, it suggests that the statements admitted at trial may have been a prelude to the privileged communications. Thus, he contends that his statements were intended to "convey a message" to her and are therefore privileged.

As a preliminary matter, the state notes that Palubicki argues only that the trial court failed to determine whether Cantrell's testimony about what she heard and observed the night of the murder was protected by the marital privilege and "does not argue that any particular portion of * * * Cantrell's testimony violated the privilege on the merits." The state urges us to construe the marital privilege narrowly and argues that Palubicki did not satisfy his burden of proof for asserting the privilege.

Specifically, the state argues that Palubicki waived the marital privilege argument with respect to statements Cantrell heard when Palubicki arrived home by fail-

ing to make proper objections. The state further argues that Palubicki made no offer of proof at trial that those statements were covered by the privilege and therefore Palubicki did not meet his burden of establishing that the statements fall within the privilege. The state also argues that the marital privilege is inapplicable with respect to Cantrell's testimony about seeing blood on Palubicki's clothes and hearing him start the washing machine after he returned home the night of the murder. Finally, the state argues that testimony from Cantrell's father regarding what Cantrell told him about what she heard and observed when Palubicki returned home the night of Olson's murder was an admissible prior consistent statement.

■ We conclude that all of Palubicki's statements that Cantrell overheard while Palubicki was speaking to Fix are not protected by the marital privilege and were properly admitted at trial. The statements were made as part of the communications between Palubicki and Fix and do not qualify as confidential communications made by one spouse to the other. *See State v. Leecy,* 294 N.W.2d 280, 283 (Minn.1980) (concluding that communications made in presence of others were not confidential communications for marital privilege purposes). To the extent that Palubicki might have intended those statements to be communications between Cantrell and him, those statements are not privileged because of Fix's presence. *See id.*

■ With respect to Cantrell's testimony about Palubicki's statements upon his returning home the night of the murder, we conclude, based on the record before us, that Palubicki did not meet his burden of proving that those statements were directed at Cantrell or intended to convey a message to her. The mere fact that Cantrell overheard the statements does not by

itself mean that the statements, when made, were communications intended to convey a meaning or message to her. *See Hannuksela,* 452 N.W.2d at 676.

Here, circumstances surrounding the statements do not indicate that Palubicki intended for Cantrell to acquire some knowledge from his words. The record suggests that when Palubicki made the statements he was angry with the way things had gone at Olson's house and was indifferent to Cantrell's presence. He did not specifically direct his words to Cantrell, nor is there an indication that he expected Cantrell to be awake when he entered the house, slammed the front door, pounded down the hallway, and screamed that things had gotten "fucked up." Further, we note that the state is correct that Palubicki failed to make an offer of proof as to how Palubicki's statements, as testified to by Cantrell, were connected to the privileged statements that were not admitted at trial.

Because we conclude that the challenged statements were not directed at or intended to convey a message to Cantrell, we also conclude that they were not protected by the marital privilege and therefore their admission was proper. Thus, we further conclude that any error by the trial court in admitting the statements without first formally determining whether the privilege applied is harmless.

■ Palubicki asserts that the marital privilege protects Cantrell's observations of him having what she described as blood-like spatters on his face, wrists, and shoes, and of him taking off his clothes and taking them to the washing machine, and her hearing the washing machine lid close and the machine being turned on. But he does not explain how her observations constitute assertive conduct intended to convey a meaning or message or what meaning or

message the conduct conveyed. Nor do we see anything inherent in what Cantrell observed or in the circumstances under which the observations were made that would provide such explanations. Absent such explanations, we conclude that there is nothing about Cantrell's observations from which it could be reasonably inferred that what she observed was assertive conduct intended by Palubicki to convey to Cantrell some particular meaning or message. Merely having one's appearance observed and being heard operating a washing machine does not constitute, without more, a communication intended to convey a message or meaning. Therefore, we conclude that the privilege is not implicated and that the admission of the testimony was not an abuse of discretion.[1]

## II.

▮▮▮ We now turn to Palubicki's claim that the trial court violated his right to present a defense by excluding alternative perpetrator evidence allegedly involving his former wife. Evidentiary rulings generally rest within the trial court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Johnson*, 568 N.W.2d 426, 432 (Minn.1997). A criminal defendant may present alternative perpetrator evidence at trial in order to cast doubt on the defendant's guilt. *State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn.1977). "Alternative perpetrator evidence is admissible if it has an inherent tendency to connect the alternative party with the commission of the crime." *State v. Jones*, 678 N.W.2d 1, 16 (Minn.2004). Alternative perpetrator evidence may include, but is not limited to, evidence of other crimes, wrongs, or acts that is separate from the charged crime. *Id.* We sometimes refer to this form of alternative perpetrator evidence as reverse-*Spreigl* alternative perpetrator evidence. *See id.; see also State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). The admission of alternative perpetrator evidence requires, first, that the defendant lay a foundation by establishing that the evidence has an inherent tendency to connect the alternative perpetrator to the actual commission of the charged crime. *Jones,* 678 N.W.2d at 16; *see also State v. Gutierrez,* 667 N.W.2d 426, 436 (Minn.2003). If the defendant fails to lay a proper foundation, the alternative perpetrator evidence is not admissible and the trial court need not consider any of the alternative perpetrator evidence further. *Gutierrez,* 667 N.W.2d at 436. If a proper foundation is laid, the defendant seeking admission of reverse-*Spreigl* alternative perpetrator evidence must then show: (1) by clear and convincing evidence that the alleged alternative perpetrator participated in the other crime, wrong, or act sought to be admitted; (2) that the evidence of the other crime, wrong, or act is relevant and material to defendant's case; and (3) that the probative value of that evidence outweighs its potential for unfair prejudice. *Jones,* 678 N.W.2d at 16–17; *see also Huff v. State,* 698 N.W.2d 430, 436 n. 4 (Minn. 2005) (explaining that clear-and-convincing standard is appropriate for reverse-*Spreigl* evidence).

In this case, Palubicki's defense theory at trial was that Cantrell was an "alternative perpetrator" because she was connected to the commission of Olson's murder and because she, along with Fix, engaged

---

1. Having concluded that the admission of Cantrell's testimony regarding Palubicki's statements to Fix and his statements upon his return home the night of Olson's murder as well as her testimony regarding her observa-

tions of Palubicki upon his return home that night does not violate the marital privilege, we also conclude that the admission of testimony by Cantrell's father does not violate the privilege.

in a common scheme to steal money and property and then blame it on Palubicki. In responding to the state's argument that Cantrell needed to be connected directly to the Olson murder, Palubicki argued that "liability for the crimes of another, along with conspiracy, is a valid connecting theory." To support his argument, Palubicki made an offer of proof that Fix robbed Petro Pete's two days after the Olson murder with assistance from Cantrell, who was on duty at the time. Palubicki offered Fix's statement to the police that Cantrell had knowledge of and seemingly participated in the robbery. Palubicki also offered a police report in which a Petro Pete's manager told the police of her suspicion that Cantrell was involved in the robbery.

The problem with Palubicki's offer of proof is that the evidence relates solely to the other crime, wrong, or act, and not to Olson's murder. The offer of proof did not include any evidence meeting the threshold requirement of laying a foundation for the admission of the alternative perpetrator evidence. To satisfy that requirement, Palubicki was required to present to the trial court evidence having an inherent tendency to connect Cantrell to the actual commission of Olson's murder. *See Jones,*

678 N.W.2d at 16. Palubicki's offer of proof involved evidence of Cantrell's knowledge of plans to rob Olson and her alleged participation in the Petro Pete's robbery along with Fix. While Palubicki argued that accomplice liability was a sufficient "connecting theory," he did not explain then, nor has he explained in his brief or argument to this court, why that evidence has an inherent tendency to connect Cantrell to the actual commission of the Olson murder. The offer of proof did not involve any evidence placing Cantrell at or near the scene of Olson's murder. Nor did the offer of proof involve any evidence from which it could be inferred that Cantrell was present at the time of the murder. During oral argument, counsel for Palubicki conceded that there was no evidence connecting Cantrell directly to Olson's murder. Based on the record before the trial court when it declined to admit Palubicki's alternative perpetrator evidence, including Palubicki's offer of proof, we conclude that Palubicki failed to satisfy the threshold requirement that he lay a proper foundation for admission of alternative perpetrator evidence.[2] As a result, we conclude that the trial court properly denied the admission of the proffered alternative perpetrator evidence and hold that the trial court did not abuse its

---

**2.** We note that Palubicki refined his argument on appeal, contending at oral argument that Cantrell was an accomplice, rather than an "alternative perpetrator," in Olson's murder and that the defense's theory was not necessarily that Cantrell actually committed the murder but rather that Fix committed the murder and Cantrell was the accomplice. Counsel argued that the Petro Pete's robbery was relevant to show both a joint enterprise between Fix and Cantrell and a pattern that the two committed crimes and blamed Palubicki, and to rebut the state's argument that Fix and Cantrell were not capable of committing crimes together. This argument fails for at least two reasons. First, because the trial court did not have the argument before it when it excluded the evidence, the argument

is not properly before this court on appeal. *Thayer v. Amer. Fin. Advisers, Inc.,* 322 N.W.2d 599, 604 (Minn.1982). The argument also fails on the merits because it suffers from the same defect that affected the argument made to the trial court. Although in this argument it is suggested that Fix committed the murder and that Cantrell was his accomplice, Palubicki points to no evidence in the record placing Cantrell at the murder scene or that she aided or abetted the commission of the murder in any way. Because meeting the threshold requirement calls for the production of evidence having an inherent tendency to connect Cantrell to the actual commission of Olson's murder and Palubicki presented no such evidence, Palubicki failed to satisfy the threshold requirement.

discretion when it declined to admit that evidence.

## III.

Palubicki further claims that the trial court committed reversible error by declining to give a jury instruction on accomplice testimony. The decision to give a requested jury instruction lies in the discretion of the trial court and will not be reversed absent an abuse of that discretion. *See State v. Daniels,* 361 N.W.2d 819, 831 (Minn.1985). A conviction cannot rest on uncorroborated testimony from an accomplice because the accomplice's credibility is inherently untrustworthy. *State v. Strommen,* 648 N.W.2d 681, 689 (Minn. 2002); *see also* Minn.Stat. § 634.04 (2004). While an accomplice testimony instruction need not be given in every criminal case, the instruction must be given in any criminal case in which any witness testifying against the defendant might reasonably be considered an accomplice to the crime. *State v. Shoop,* 441 N.W.2d 475, 479 (Minn. 1989). If it is unclear whether a witness is an accomplice, the jury should make the determination. *Id.*

The general test for determining whether a witness is an accomplice is whether the witness could have been indicted and convicted for the crime with which the accused is charged. *State v. Pederson,* 614 N.W.2d 724, 733 (Minn. 2000). A person may be held criminally liable for a crime committed by another if the person aided and abetted the other in the commission of the crime. *See* Minn. Stat. § 609.05, subd. 1 (2004). When imposing liability for aiding and abetting, we distinguish between playing "a knowing role in the crime" and having "[a] mere presence at the scene, inaction, knowledge and passive acquiescence." *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000). We have held that the "presence, companion-

ship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *Id.*

In this case, Palubicki requested that the trial court give the following jury instruction:

> If you find that Joy Cantrell is a person who could be charged with the same crime as the defendant, you cannot find the defendant guilty of a crime on that testimony unless that testimony is corroborated.

As an alternative, Palubicki proposed:

> If you find that any person who has testified in this case is a person who could be charged with the same crime as the defendant, you cannot find the defendant guilty of a crime on that testimony unless that testimony is corroborated.

The court did instruct the jury that Palubicki could not be convicted on the uncorroborated testimony of an accomplice. The court further instructed the jury that Fix was an accomplice, but denied Palubicki's request to give a similar instruction with respect to Cantrell.

Palubicki argues that there was ample evidence admitted at trial from which the jury reasonably could have concluded that Cantrell was an accomplice to Olson's murder. Palubicki bases this argument on trial evidence indicating that before Olson's murder Cantrell was aware of the plan to burglarize Olson's home and knew Palubicki intended to use force against Olson if necessary. He also cites Cantrell's testimony that she was present when Fix and Palubicki made the burglary plan and took no steps to prevent it. In addition, Palubicki references Fix's testimony that Cantrell participated in destroying evidence and asked Palubicki whether he got any money. Further, Palubicki re-

lies on testimony that he stated in Cantrell's presence that things had gone wrong and that she saw him change and wash his clothes. At oral argument, counsel for Palubicki raised the additional argument that we should consider evidence related to Cantrell's involvement in the Petro Pete's robbery to determine whether he was entitled to the accomplice jury instruction. Based on the above evidence, Palubicki asserts that the jury could have inferred that Palubicki perceived Cantrell as someone who was aware of and supported his criminal activity.

We conclude that the evidence relied on by Palubicki is insufficient to create a question for the jury as to whether Cantrell reasonably could be considered an accomplice for purposes of requiring an accomplice jury instruction. None of the evidence relied on by Palubicki indicates that Cantrell was present at the time of the murder or participated in the murder in any way. While there was evidence that Cantrell was aware of the plan to rob Olson based on her presence when Fix and Palubicki were discussing those plans, there is no evidence from which it could be inferred that she participated in those plans; her mere knowledge of or passive acquiescence in the plan is insufficient to create accomplice liability. *Gates*, 615 N.W.2d at 337. Although it can be inferred, from Fix's testimony that Cantrell participated in destroying evidence and inquired about whether Palubicki and Fix got any money from robbing Olson, that Cantrell could have some criminal liability for being an accessory after the fact, the evidence does not suggest that she played a knowing role in the commission of Olson's murder. *Id.* Nor does the fact that Cantrell heard Palubicki say that things had gone wrong or that she saw him change and wash his clothes. Finally, with respect to Palubicki's argument that evidence of Cantrell's participation in the Pe-

tro Pete's robbery suggests that she was an accomplice to the Olson murder, we note simply that evidence of her involvement in the Petro Pete's robbery, without more, does not implicate her in the Olson robbery or murder. Therefore, we hold that the trial court did not abuse its discretion when it declined to give an accomplice jury instruction with respect to Cantrell.

## IV.

Palubicki also claims he was denied a fair trial when the state on two occasions elicited irrelevant and prejudicial testimony about his character. Evidentiary matters are reviewed for abuse of discretion. *State v. Willis*, 559 N.W.2d 693, 698 (Minn.1997). When, as here, evidence is admitted without objection, this court reviews for plain error, which requires the defendant to show: (1) error, (2) that was plain, and (3) that affected substantial rights. *Strommen*, 648 N.W.2d at 686. "If those three prongs are met, we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn.2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotation marks and citations omitted)).

A prosecutor cannot attack the character of the defendant unless the defendant puts his or her character in issue. Minn. R. Evid. 404(a)(1). At trial, Cantrell, in response to the state's questions about her divorce, testified that she divorced Palubicki because he was "a violent person." Palubicki did not object to this testimony. The state argues and the record fairly reflects that the state did not purposely elicit Cantrell's statement. On appeal, the state concedes that Cantrell's statement about Palubicki being a violent person was irrelevant. Because the defense did not

put Palubicki's character in issue, the admission of Cantrell's statement was error. Because the error was clear and obvious, it was also "plain." *See Strommen*, 648 N.W.2d at 688. On the record before us, however, we conclude that admission of this one isolated unobjected-to statement did not affect Palubicki's substantial rights. *See Bernhardt v. State*, 684 N.W.2d 465, 475 (Minn.2004) (holding that substantial rights are implicated when error was prejudicial and affected outcome of case).

■ Palubicki also challenges Cantrell's response to a state's question in which she agreed that Palubicki was a "leader" and that Fix was a "follower." The transcript shows that Cantrell's testimony was specifically sought by the state. One theory Palubicki raised at trial was that Fix planned the robbery and committed the murder. Fix testified that Palubicki proposed the robbery, led Fix to Olson's house, told Fix to wait in the garage, and after the murder directed Fix to drive away. Thus, Cantrell's testimony about Palubicki's leadership was directly relevant to an issue in dispute at trial. Therefore, we conclude that the state's elicitation of Cantrell's testimony that Palubicki was a leader did not constitute prosecutorial misconduct and the admission of the testimony was not error.

## V.

Palubicki next claims that he was denied a fair trial because the state committed discovery violations and prosecutorial misconduct. Specifically, he claims that the state: (1) violated Minn. R.Crim. P. 9.01, subd. 1(2), when it refused to disclose certain communications between the state and its main witnesses; (2) violated Minn. R.Crim. P. 9.01, subd. 1(1)(a), by calling witnesses who were not on the original witness list; (3) improperly elicited testi-

mony that Palubicki had been "glaring" at a police officer; and (4) in closing argument, wrongfully urged the jury to infer Palubicki's violent character from the state's description of the murder.

■ Whether a discovery violation occurred is an issue of law which this court reviews de novo. *State v. Bailey*, 677 N.W.2d 380, 397 (Minn.2004). We review a trial court's decision on whether to impose sanctions for discovery violations for an abuse of discretion. *State v. Patterson*, 587 N.W.2d 45, 50 (Minn.1998). Generally, without a showing of prejudice to the defendant, the state's violation of a discovery rule will not result in a new trial. The determination of whether this court will grant a new trial due to prosecutorial misconduct "is governed by no fixed rules but rests within the discretion of the trial judge, who is in the best position to appraise its effect." *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980). A trial court's determination should be reversed on appeal only when the prosecutor's misconduct, "viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that [the] defendant's right to a fair trial was denied." *Id.* But the misconduct is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error. *State v. Hunt*, 615 N.W.2d 294, 301–02 (Minn.2000).

■ The facts relating to the state's alleged violation of Rule 9.01, subdivision 1(2), are as follows. At a pretrial hearing, defense counsel asked the state to identify all contacts the state had had with Cantrell and Fix. Defense counsel argued, "under Rule 9.01, we're entitled to also any communications that they've had with these particular witnesses even if it's only oral, at least the summary or the substance of what was spoken." In response, the state argued that it was required to disclose

only the substance of a witness's oral statements when the witness discloses something "new or different" from previously disclosed statements. The trial court agreed with the state and denied defense counsel's request.

Minnesota Rule of Criminal Procedure 9.01, subdivision 1(2), provides:

Statements. The prosecuting attorney *shall disclose* and permit defense counsel to inspect and reproduce *any* relevant written or recorded statements which relate to the case within the possession or control of the prosecution, the existence of which is known by the prosecuting attorney, and *shall provide* defense counsel with the substance of *any* oral statements which relate to the case.

(Emphasis added.) By using the words "shall disclose" and "shall provide," the rule's directions are mandatory. Moreover, we read the rule's use of the word "any" to mean "every." Therefore, to the extent that the state failed to disclose or to provide the substance of every oral statement required by the rule, the rule was violated and the trial court's failure to require such disclosure was error.

■■ Palubicki also alleges that the state engaged in discovery violations when it failed to disclose, before the court-imposed discovery deadline, the names of three witnesses it intended to call at trial. The witnesses were a Minnesota Bureau of Criminal Apprehension agent who had examined the site where Fix and Palubicki burned the clothing, the neighbor of Olson's who heard the noisy vehicle the night of Olson's murder, and Cantrell's mother. At trial, Palubicki moved to prohibit the state from calling these individuals to testify. The trial court denied the motions, finding that the state's failure to disclose the witnesses was unintentional and resulted in no prejudice to Palubicki.

■■ Minnesota Rule of Criminal Procedure 9.01 provides:

Subd. 1. Disclosure by Prosecution Without Order of Court. Without order of court and except as provided in Rule 9.01, subd. 3, the prosecuting attorney on request of defense counsel *shall,* before the date set for Omnibus Hearing provided for by Rule 11, allow access at any reasonable time to all matters within the prosecuting attorney's possession or control which relate to the case and make the following disclosures:

(1) Trial Witnesses; Grand Jury Witnesses; Other Persons.

(a) The prosecuting attorney *shall disclose* to defense counsel the names and addresses of the persons intended to be called as witnesses at the trial together with their prior record of convictions, if any, within the prosecuting attorney's actual knowledge. The prosecuting attorney *shall permit* defense counsel to inspect and reproduce such witnesses' relevant written or recorded statements and any written summaries within the prosecuting attorney's knowledge of the substance of relevant oral statements made by such witnesses to prosecution agents.

(Emphasis added.) Given the rule's mandatory language, we conclude that the state violated Rule 9.01, subdivision 1(1)(a), when it failed to timely disclose the witnesses. We also conclude, however, that the trial court did not abuse its discretion when it declined to impose a sanction for the violation.

Palubicki does not allege that either discovery violation resulted in prejudice to him, nor does our review of the record identify any such prejudice. Palubicki does ask that we exercise our supervisory powers as a prophylactic measure and grant him a new trial. We decline to do so on this record.

With respect to Palubicki's remaining prosecutorial misconduct claims, we see no reason to labor over the question of whether such misconduct occurred. It is enough to note that we have thoroughly reviewed the record and conclude that any misconduct that may have occurred was not so serious or prejudicial that Palubicki's right to a fair trial was denied.

## VI.

Finally, the state concedes that the trial court erred when it ordered Palubicki to pay a $200 co-payment for public defender services without first determining Palubicki's ability to pay. We agree. *See State v. Tennin,* 674 N.W.2d 403, 410–11 (Minn.2004) (holding that Minn.Stat. § 611.17, subd. 1(c) (Supp.2003), which directs that public defender's client "shall be obligated" to pay fee, was unconstitutional because it contains no protections for the indigent or those for whom the co-payment would impose a manifest hardship); *see also Fuller v. Oregon,* 417 U.S. 40, 46, 54, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974) (affirming statute in which "ability to pay" for public defender services was required inquiry). The state also concedes that the trial court erred when it entered separate adjudications and sentences for each of Palubicki's first-degree murder convictions. Again, we agree. *See State v. Johnson,* 616 N.W.2d 720, 730 (Minn.2000). Palubicki asks that we vacate the public defender co-payment and two of the three adjudicated convictions and sentences. The state asks that we remand so the trial court can: (1) determine whether Palubicki has the ability to pay the co-payment; and (2) decide which two of Palubicki's three convictions and sentences should be vacated.

With respect to the $200 co-payment, in the interests of judicial economy we vacate the order requiring the payment. With respect to the question of which convictions and sentences to vacate, we remand to the trial court to make that determination.

Convictions affirmed and remanded for re-adjudication and sentencing.