*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1809**

State of Minnesota,
Respondent,

vs.

Royale Romeo Harris,
Appellant.

**Filed December 26, 2023**
**Affirmed**
**Smith, Tracy M., Judge**

Washington County District Court
File No. 82-CR-19-4446

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kevin Magnuson, Washington County Attorney, Kayla K. Wengronowitz, Assistant County Attorney, Stillwater, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Reyes, Judge; and Smith, Tracy M., Judge.

**NONPRECEDENTIAL OPINION**

**SMITH, TRACY M.**, Judge

In this direct appeal from a judgment of conviction for the nonconsensual dissemination of private sexual images, appellant Royale Romeo Harris argues that the prosecution violated its obligations under Minnesota Rule of Criminal Procedure 9.01 and

*Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the substance of statements made by the complainant to the prosecutor and victim-witness advocate during a phone call. We affirm.

**FACTS**

In October 2019, respondent State of Minnesota charged Harris with the nonconsensual dissemination of private sexual images of A.C., with whom he was previously in a relationship. Thereafter, defense counsel requested "[t]hat the State provide the defense with written summaries of all conversations between all witnesses and the prosecuting attorney" and "victim-witness personnel." The prosecution provided defense counsel with a summary of one phone call in October 2021 between A.C. and the prosecutor and victim-witness advocate in which A.C. discussed the offense. The matter proceeded to a jury trial in February 2022.

At trial, A.C. testified about the events that led to the charges against Harris. The events all took place on the same day in September 2019, after Harris and A.C.'s relationship had already ended. Harris called A.C. at work more than 80 times, but she ignored his phone calls. Harris left her the following voicemail message:

> That post was made to public. All of them were. You're such a wonderful person. You're amazing. I appreciate you doing me the way that you did. Having no faith in me after you telling me how much you loved me. Now you got a new guy 'cuz you done took your meds, you good now. I'm glad you did me like that. You deserve everything you got coming to you. I was a good dude to your kids. You want to blame all your problems on me. Karma's going to get you and I can't wait.

After receiving the message, A.C. received a phone call from her daughter about a post on Facebook. A friend also advised A.C. to check Facebook. A.C. discovered that Harris had posted to his Facebook account a photo of her appearing partially nude and a video that depicted them in a sexual act; A.C. was tagged in the posts. Harris also made derogatory comments about A.C. in the posts.

Although A.C. had sent Harris the photo and consented to Harris recording the video, A.C. did not consent to Harris posting the photo or video online. A.C. called Harris and begged him to remove the photo and video, but he refused to do so. A.C. then called Harris's mother and asked her to try to convince Harris to remove the posts. When Harris continued to display the photo and video on his Facebook account, A.C. contacted the police. A.C. took screenshots of Harris's Facebook page, and her friend made a screen recording[1] of the posts and sent it to her. A.C. sent the police the screenshots and screen recording as well as Harris's voicemail.

On recross-examination of A.C., defense counsel asked her whether she wanted to see Harris prosecuted. She responded:

> I wanted the posts to come down. I also asked for this trial to be cancelled because I already got what I wanted out of it.
> I believe if somebody does somebody wrong to somebody that, yes, they should pay for it. But I moved on with my life and I didn't want to rehash all of these old feelings. I got what I wanted out of it.
> He knows the truth, God knows the truth. I have no reason to lie about any of it. I got what I wanted, I wanted the posts to come down and I wanted [Harris] to leave me alone,

---

[1] Similar to a screenshot, a screen recording captures what appears on the screen of a device as a video.

which is what he has been doing over the past three years, that's what I wanted.

I tried dropping it several times and they wouldn't let me.

After A.C. completed her testimony and was released by the district court, defense counsel raised a concern that A.C. suggested in her testimony that she had communicated with the prosecution about dropping the case but the prosecution had not disclosed summaries of those statements.

The prosecution acknowledged that it had not disclosed a January 25, 2022 phone call with A.C. to inform her that the trial had been continued. The prosecutor then shared her notes of A.C.'s statements during that phone call:

> [M]yself and [the victim-witness advocate] spoke with [A.C.] via phone. She is fatigued by court in general. She testified in a different case also has a case that she is a victim of in Washington County. She explains the nature of that case a little bit. Not my case, unrelated to this. Kids have been sick with COVID. Financially struggling and feels her job is in jeopardy even though she knows they legally have to let her go with a subpoena. The stress of life is just really difficult right now, and other cases are more serious bigger priority to her. She does not want to invest her time in this case anymore. Everything she wanted out of this case has already happened. Those being, one, the photos were taken down; two, the defendant had stopped harassing her. She reiterated that she is not wanting to come to court and testify any further. Agreed we would follow up with her after I had conversations within my office. She appreciated that I was understanding of her situation. She agreed that the case -- she agreed the case was solid but I was going to consider her thoughts and life circumstances as I want to place a balancing upon accountability but not at her expense. She thanked us for our conversation.

4

The district court offered to permit the defense to take a break to speak with the victim-witness advocate and to call that person to testify about A.C.'s undisclosed statements, but Harris declined the offer. Harris then moved for a mistrial. The district court denied the motion.

The jury found Harris guilty of nonconsensual dissemination of private sexual images. The district court granted Harris's motion for a downward dispositional departure and sentenced him to a stayed term of 19 months in prison, placing him on probation for three years.

Harris appeals.

## DECISION

Harris argues that he is entitled to a new trial because the prosecution's failure to disclose the substance of A.C.'s statements made during the January 2022 phone call violated its obligations pursuant to Minnesota Rule of Criminal Procedure 9.01 and *Brady*. We address each argument in turn.

**Discovery Violation Under Minn. R. Crim. P. 9.01**

Appellate courts review de novo whether a discovery violation occurred. *State v. Palubicki*, 700 N.W.2d 476, 489 (Minn. 2005). But we review a district court's decision to impose discovery sanctions for an abuse of discretion. *See id.* A reviewing court should not order a new trial to remedy a discovery violation unless there is a reasonable probability that the evidence would have affected the outcome of the trial. *State v. Clobes*, 422 N.W.2d 252, 255 (Minn. 1988).

At the defense's request and before the omnibus hearing, the prosecution must "allow access at any reasonable time to all matters within the prosecutor's possession or control that relate to the case," unless they are privileged. Minn. R. Crim. P. 9.01, subd. 1. The prosecution must also disclose "[a]ny" statements "known to the prosecutor that relate to the case," including "the substance of oral statements." *Id.*, subd. 1(2)(c). The word "any" means "every." *Palubicki*, 700 N.W.2d at 490.

Harris contends that A.C.'s statements in the January 2022 phone call "relate[] to the case" because they are "important" and "[i]t is material that a witness did not . . . want to appear in court and swear an oath to tell." The state contends that A.C.'s statements do not "relate to the case" because they "relate to the witness's availability and opinions about coming to court" and "do not reveal any material, relevant, inculpatory, or exculpatory information."

The parties do not cite any authority in support of their respective interpretations of statements that "relate to the case." In an unpublished opinion,[2] this court stated that "[t]he correct standard for production under Rule 9.01 is any statement that relates to the case, without an exception for conversations related to scheduling matters." *State v. Chaney*, No. A14-1513, 2015 WL 5088943, at *9 (Minn. App. Aug. 31, 2015) (concluding that "the district court incorrectly found that the state did not have to produce statements related to the case that deal with procedural matters"), *rev. denied* (Minn. Nov. 17, 2015). Although

---

[2] In 2020, an amendment to the Minnesota Rules of Civil Appellate Procedure changed the terminology from "unpublished" to "nonprecedential" when referring to this court's nonbinding opinions. *See* Minn. R. Civ. App. P. 136.01, subd. 1.

the opinion is not precedential, we find the interpretation in *Chaney* to be persuasive, and we adopt it here. Thus, A.C.'s statements during the January 2022 phone call discussing the trial continuance relate to the case and the prosecution should have disclosed them.

Nonetheless, this discovery violation does not warrant a new trial. Although Harris points out that his trial counsel said that the statements were "something that [he] would have been able to explore at length and prepare for [A.C.'s] cross-examination had [he] known about [them] ahead of time," Harris does not explain what defense counsel would have done differently or how an earlier disclosure of A.C.'s statements would have affected the outcome of the trial. Furthermore, the record demonstrates that A.C.'s statements were mostly consistent with her trial testimony regarding her feelings about the case, and defense counsel had the opportunity to cross-examine A.C. about her testimony that she had wanted the case to be dropped. Additionally, Harris declined the district court's offer to call the victim-witness advocate to testify about any inconsistencies between A.C.'s statements and her trial testimony. Because the record does not show a reasonable probability that the discovery violation affected the outcome of the trial, Harris is not entitled to a new trial.

### *Brady* Violation

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Thus, a *Brady* violation requires that (1) the evidence is favorable to the defendant as either exculpatory or impeaching, (2) the evidence was suppressed by the prosecution, and (3) the evidence is material. *Walen v. State*, 777

7

N.W.2d 213, 216 (Minn. 2010). The state concedes the second element—that it suppressed the evidence of A.C.'s statements made to the prosecutor and victim-witness advocate during the January 2022 phone call—but argues that the suppressed evidence is neither favorable nor material. Appellate courts review alleged *Brady* violations de novo. *Zornes v. State*, 903 N.W.2d 411, 417 (Minn. 2017).

Harris contends that A.C.'s statements are favorable as impeachment evidence. The state asserts that A.C.'s statements could not have been used for impeachment purposes because they were "consistent with her trial testimony" and "did not tend to show bias or untruthfulness." We conclude that, though Harris does not identify how the statements would have been used to impeach A.C., the statements could have been used as prior inconsistent statements to show that, despite her trial testimony that she asked to have the case dropped and the trial canceled, A.C. did not ask the prosecutor during the January 2022 phone call to drop the case or cancel the trial.[3] Therefore, Harris meets the favorability element.

Harris's argument, however, fails on the materiality element. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pederson v. State*, 692 N.W.2d 452, 460 (Minn. 2005) (quotation omitted). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* (quotation omitted).

---

[3] *See* Minn. R. Evid. 613 (permitting the admission of prior inconsistent statements for impeachment purposes).

Although Harris speculates that his trial counsel "would have prepared and executed the cross-examination of A.C. differently had he known about the statement[s]," Harris does not explain what that different preparation and execution of cross-examination would have been or how it would have affected the outcome of the case. Because Harris makes no showing of a reasonable probability that the disclosure of A.C.'s statements would have resulted in a different verdict, he has not established that A.C.'s statements are material. Harris's *Brady* argument therefore fails.

In conclusion, because there is not a reasonable probability that the discovery violation affected the outcome of the trial and because Harris has not established a *Brady* violation, Harris is not entitled to a new trial.

**Affirmed.**